# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## CINCINNATI DIVISION

| | |
|---|---|
| VICTORIA LOVETT, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CONTINUED.COM, LLC,<br><br>Defendant. | Civil Action No. _____<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

## INTRODUCTION

Victoria Lovett ("Plaintiff"), individually and on behalf of all others similarly situated, makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to allegations pertaining specifically to herself or her counsel, which are based on personal knowledge.

## NATURE OF THE CASE

1.      Plaintiff brings this action to redress Defendant Continued.com, LLC's ("Continued") practices of knowingly disclosing Plaintiff's and its other customers' identities and their purchases of subscriptions to access prerecorded video content to Meta Platforms, Inc. ("Meta"), formerly known as Facebook, Inc. ("Facebook"), in violation of the federal Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710 et seq.

2.      Over the past two years, Defendant has systematically transmitted (and continues to transmit today) its customers' personally identifying video viewing information to Meta using a snippet of programming code called the "Meta Pixel," which Defendant chose to install and configure on its family of websites that include but are not limited to: www.speechpathology.com, www.occupationaltherapy.com, www.audiologyonline.com, and www.physicaltherapy.com (collectively, "Websites").

1

3. The information Defendant disclosed (and continues to disclose) to Meta via the Meta Pixel includes the customer's Facebook ID ("FID") and the subscription that each of its customers purchased on its Website. An FID is a unique sequence of numbers linked to a specific Meta profile. A Meta profile, in turn, identifies by name the specific person to whom the profile belongs (and also contains other personally identifying information about the person). Entering "Facebook.com/[FID]" into a web browser returns the Meta profile of the person to whom the FID corresponds. Thus, the FID identifies a person more precisely than a name, as numerous persons may share the same name, but each person's Facebook profile (and associated FID) uniquely identifies one and only one person. In the simplest terms, the Meta Pixel installed by Defendant captures and discloses to Meta information that reveals a particular person purchased a subscription to access prerecorded video content on Defendant's Websites (hereinafter, "Private Viewing Information").

4. Defendant disclosed and continues to disclose its customers' Private Viewing Information to Meta without asking for, let alone obtaining, their consent to these practices.

5. The VPPA clearly prohibits what Defendant has done. Subsection (b)(1) of the VPPA provides that, absent the consumer's prior informed, written consent, any "video tape service provider who knowingly discloses, to any person,

personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for," 18 U.S.C. § 2710(b)(1), damages in the amount of $2,500.00, *see id.* § 2710(c).

6.    Accordingly, on behalf of herself and the putative Class members defined below, Plaintiff brings this Class Action Complaint against Defendant for intentionally and unlawfully disclosing her and the Putative Class members' Private Viewing Information to Meta.

## PARTIES

### I.    Plaintiff Victoria Lovett

7.    Plaintiff is, and at all times relevant hereto was, a citizen and resident of Brooks County, Georgia.

8.    Plaintiff is, and at all times relevant hereto was, a user of Meta.

9.    Plaintiff is a consumer of the video products and services offered on Defendant's www.speechapathology.com website. She subscribed to Defendant's website on or about August 15, 2023 and maintained her subscription throughout the term of the plan selected. Plaintiff became a subscriber to Defendant's website by registering and paying for a subscription and providing her email address, payment information, and zip code.

10. On multiple occasions during the two years preceding the filing of this action, Plaintiff used her subscription to Defendant's website to request and obtain pre-recorded videos from Defendant.

11. At all times relevant hereto, including when purchasing a subscription to Defendant's website and accessing and obtaining the prerecorded video material provided to subscribers on Defendant's website, Plaintiff had a Meta account, a Meta profile, and an FID associated with such profile.

12. Plaintiff has never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Private Viewing Information to Meta. In fact, Defendant has never even provided Plaintiff with written notice of its practices of disclosing its customers' Private Viewing Information to third parties such as Meta.

13. Because Defendant disclosed Plaintiff's Private Viewing Information (including her FID and her purchase of a subscription to Defendant's website) to Meta during the applicable statutory period, Defendant violated Plaintiff's rights under the VPPA and invaded her statutorily conferred interest in keeping such information (which bears on her personal affairs and concerns) private.

II. **Defendant Continued.com, LLC**

14. Defendant is a foreign limited liability company organized under the laws of the State of Texas. Defendant operates and maintains a family of Websites, where it sells subscriptions to access prerecorded video content on various topics

4

such as Speech Pathology, Audiology, and Occupational Therapy.

## JURISDICTION AND VENUE

15.     The Court has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2710.

16.     Personal jurisdiction and venue are proper because a substantial portion of Defendant's maintenance, use, and operation of its family of Websites occurs in Hamilton County, within this judicial District.

## VIDEO PRIVACY PROTECTION ACT

17.     The VPPA prohibits companies (like Defendant) from knowingly disclosing to third parties (like Meta) information that personally identifies consumers (like Plaintiff) as having viewed particular videos or other audio-visual materials.

18.     Specifically, subject to certain exceptions that do not apply here, the VPPA prohibits "a video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider[.]"  18 U.S.C. § 2710(b)(1).  The statute defines a "video tape service provider" as "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4).  It defines a "consumer" as "a renter, purchaser, or subscriber of goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1).

"'[P]ersonally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

19.     Leading up to the VPPA's enactment in 1988, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." *Id.*   Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials because such records offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

20.     Thus, in proposing the Video and Library Privacy Protection Act (which later became the VPPA), Senator Patrick J. Leahy (the senior Senator from Vermont from 1975 to 2023) sought to codify, as a matter of law, that "our right to privacy protects the choice of movies that we watch with our family in our own homes." 134 Cong. Rec. S5399 (May 10, 1988). As Senator Leahy explained at the time, the personal nature of such information, and the need to protect it from disclosure, is the raison d'être of the statute: "These activities are at the core of any

definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id*.

21.     While these statements rang true in 1988 when the act was passed, the importance of legislation like the VPPA in the modern era of data mining is more pronounced than ever before. During a more recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[1]

22.     Former Senator Al Franken may have said it best: "If someone wants to share what they watch, I want them to be able to do so . . . But I want to make sure that consumers have the right to easily control who finds out what they watch—and who doesn't. The Video Privacy Protection Act guarantees them that right."[2]

---

[1] The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary. senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21stcentury.

[2] Chairman Franken Holds Hearing on Updated Video Privacy Law for 21st Century, franken.senate.gov (Jan. 31, 2012).

23.     In this case, however, Defendant deprived Plaintiff and numerous other similarly situated persons of that right by systematically (and surreptitiously) disclosing their Private Viewing Information to Meta, without providing notice to (let alone obtaining consent from) any of them, as explained in detail below.

## BACKGROUND FACTS

### I.     Consumers' Personal Information Has Real Market Value

24.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[3]

25.     Over two decades later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a 26 billion dollar per year online advertising industry in the United States.[4]

26.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

---

[3] Transcript, *The Information Marketplace* (Mar. 13, 2001), at 8-11, available at https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

[4] *See* Julia Angwin and Emily Steel*, Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb. 28, 2011), available at https://www.wsj.com/articles/SB10001424052748703529004576160764037920274.

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[5]

27.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers. Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[6]

28.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[7]

29.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[8]

---

[5]     Statement of FTC Cmr. Harbour (Dec. 7, 2009), at 2, available at https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf

[6]     *See* M. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), available at http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ .

[7]     N. Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), available at https://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html#:~:text=It's%20called%20the%20Acxiom%20Corporation,to%20know%20much%2C%20much%20more.

[8]     Letter from Sen. J. Rockefeller IV, Sen. Cmtee. On Commerce, Science, and Transportation, to S. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) available at https://www.commerce.senate.gov/services/files/3bb94703-5ac8-4157-a97b-%20a658c3c3061c.

30.     Recognizing the severe threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data, stating in pertinent part:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[9]

31.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers. In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams, including fraudulent sweepstakes, charities, and buying clubs.   Thus, when companies like Onnit share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly

---

[9] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Sen. Markey (July 24, 2012), available at https://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information.

traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[10]

32.    Disclosures like Defendant's are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[11]

33.    The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[12]

34.    Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged.    Thus, information disclosures like Defendant's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[13]

35.    Defendant is not alone in violating its customers' statutory rights and jeopardizing their well-being in exchange for increased revenue: disclosing customer

---

[10] *See* Charles Duhigg, *Bilking the Elderly, with a Corporate Assist*, N.Y. Times (May 20, 2007), available at https://www.nytimes.com/2007/05/20/business/20tele.html.

[11] *Id.*

[12] Prepared Statement of the FTC on "Fraud Against Seniors" before the Special Committee on Aging, United States Senate (August 10, 2000).
[13] *Id.*

and subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties has become a widespread practice. Unfortunately for consumers, however, this growth has come at the expense of their most basic privacy rights.

## II.   Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases

36.   As the data aggregation industry has grown, so has consumer concerns regarding personal information.

37.   A survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do protect their privacy online.[14] As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[15]

38.   Thus, as consumer privacy concerns grow, consumers increasingly incorporate privacy concerns and values into their purchasing decisions, and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.   In fact, consumers' personal information has

---

[14] *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf.

[15] *Id*.

become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[16]

39.    These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[17]

40.    Thus, in today's digital economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[18]   As such, where a business offers customers a product or service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a product or service of less value than the product or service paid for.

_____

[16] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), available at https://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html.

[17] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on Monetizing Privacy* (Feb. 27, 2012), available at https://www.enisa.europa.eu/publications/monetising-privacy.

[18] *See* Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, available at https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf.

### III. Defendant Uses the Meta Pixel to Systematically Disclose its Customers' Private Viewing Information to Meta

41.    As alleged below, when a consumer requests or obtains a specific subscription from one of Defendant's Websites, the Meta Pixel technology that Defendant intentionally installed on its Websites transmits the fact that a consumer purchased a subscription to video materials or services alongside his or her FID to Meta, without the subscriber's consent and in clear violation of the VPPA.

### A. The Meta Pixel

42.    On February 4, 2004, Mark Zuckerberg and others launched Facebook, now known as "Meta".[19] Meta is now the world's largest social media platform. To create a Meta account, a person must provide, *inter alia*, his or her first and last name, birth date, gender, and phone number or email address.

43.    The Meta Pixel, first introduced in 2013 as the "Facebook Pixel," is a unique string of code that companies can embed on their websites to monitor and track the actions taken by visitors to their websites and to report them back to Meta. This allows companies like Defendant to build detailed profiles about their customers and to serve them with highly targeted advertising.

---

[19] *See* Facebook, "Company Info," available at https://about.fb.com/company-info./.

44. Additionally, a Meta Pixel installed on a company's website allows Meta to "match [] website visitors to their respective Facebook User accounts."[20] This is because Meta has assigned to each of its users an "FID" number – a unique and persistent identifier that allows anyone to look up the user's unique Meta profile and thus identify the user by name[21] – and because each transmission of information made from a company's website to Meta via the Meta Pixel is accompanied by, *inter alia*, the FID of the website's visitor. Moreover, the Meta Pixel can follow a consumer to different websites and across the Internet even after the consumer's browser history has been cleared.

45. Meta has used the Meta Pixel to amass a vast digital database of dossiers comprised of highly detailed personally identifying information about each of its billions of users worldwide, including information about all of its users' interactions with any of the millions of websites across the Internet on which the Meta Pixel is installed. Meta then monetizes this Orwellian database by selling advertisers the ability to serve highly targeted advertisements to the persons whose personal information is contained within it.

---

[20] Meta, "Get Started – Meta Pixel," available at https://developers.facebook.com/docs/meta-pixel/get-started/.

[21] For example, Mark Zuckerberg's FID is reportedly the number "4," so logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck, and all of the additional personally identifiable information contained therein.

46.    Simply put, if a company chooses to install the Meta Pixel on its website, both the company who installed it and Meta (the recipient of the information it transmits) are then able to "track [] the people and type of actions they take,"[22] including, as relevant here, the subscription to access prerecorded video material or services that they purchase on any one of Defendant's Websites.

**B. Defendant Knowingly Uses the Meta Pixel to Transmit the Private Viewing Information of its Customers to Meta**

47.    Defendant's paid subscriptions include exclusive access to prerecorded video content including a video library of on-demand videos, courses, and continuing education.

48.    To purchase a subscription to the prerecorded video material on any one of Defendant's Websites, a person must provide at least his or her name, email address, billing address, and credit or debit card (or other form of payment) information.

---

[22] Meta, "Retargeting: How to Advertise to Existing Customers with Ads on Facebook," available at https://www.facebook.com/business/goals/retargeting?checkpoint_src=any.

49.     When a consumer is completing the subscription process to gain access to the prerecorded videos on any one of Defendant's Websites, Defendant uses – and has used at all times relevant hereto – the Meta Pixel to disclose to Meta the unencrypted FID of the subscriber and the fact that the person is requesting or obtaining a subscription to Defendant's website.

50.     Defendant intentionally programmed its websites (by following step-by-step instructions from Meta's website) to include a Meta Pixel that systematically transmits to Meta the FIDs of its subscribers and the fact that a subscription was purchased by each of them in order to take advantage of the targeted advertising and other informational and analytical services offered by Meta.

51.     With only a person's FID and the knowledge that a person purchased a subscription to Defendant's website—all of which Defendant knowingly provides to Meta —any ordinary person could learn the identity of the person to whom the FID corresponds and the specific video products or services that this person requested. This can be accomplished simply by accessing the URL www.facebook.com/[unencrypted FID]/.

52.     Defendant's practices of disclosing that Plaintiff and members of the Classes purchased subscriptions on any one of Defendant's websites to Meta continued unabated for the full duration of the time period relevant to this action. At all times relevant hereto, whenever Plaintiff or another subscriber of Defendant's

family of websites requested or obtained a particular subscription (by clicking on it) on any one of Defendant's Websites, Defendant disclosed to Meta that (*inter alia*) the purchaser requested or obtained a subscription to video materials or services, along with the FID of the subscriber who requested it (which, as discussed above, uniquely identifies the person).

53. At all relevant times, Defendant knew the Meta Pixel disclosed its subscribers' Private Viewing Information to Meta.

54. Defendant could easily have programmed its websites so that none of its subscribers' detailed Private Viewing Information is disclosed to Meta. Instead, Defendant chose to program its websites so that all of its subscribers' detailed Private Viewing Information is sent to Meta *en masse*.

55. Prior to transmitting its subscribers' Private Viewing Information to Meta, Defendant failed to notify Plaintiff or any of its other subscribers that it would do so, and neither Plaintiff nor any of its other subscribers have consented (in writing or otherwise) to these practices.

56. By intentionally disclosing to Meta Plaintiff's and its other subscribers' FIDs together with information that they each purchased a subscription to prerecorded video material or services, without any of their consent to these practices, Defendant knowingly violated the VPPA on an enormous scale.

<strong>CLASS ACTION ALLEGATIONS</strong>

57. Plaintiff seeks to represent a class defined as all persons in the United States who, during the two years preceding the filing of this action, purchased a subscription to access prerecorded video material or services from any one of Defendant's family of Websites while maintaining an account with Meta Platforms, Inc. f/k/a Facebook, Inc.

58. Class members are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in at least the tens of thousands. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the membership records of Defendant.

59. Common questions of law and fact exist for all Class members and predominate over questions affecting only individual class members. Common legal and factual questions include but are not limited to (a) whether Defendant embedded Meta Pixel on its Websites that monitors and tracks actions taken by visitors to its Website; (b) whether Defendant reports the actions and information of visitors to Meta; (c) whether Defendant knowingly disclosed Plaintiff's and Class members' Private Viewing Information to Meta; (d) whether Defendant's conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710; and (e) whether

Plaintiff and Class members are entitled to a statutory damage award of $2,500, as provided by the VPPA.

60. The named Plaintiff's claims are typical of the claims of the Class in that the Defendant's conduct toward the putative class is the same. That is, Defendant embedded Meta Pixel on its Websites to monitor and track actions taken by consumers on its Websites and report this to Meta. Further, the named Plaintiff and the Class members suffered invasions of their statutorily protected right to privacy (as afforded by the VPPA), as well as intrusions upon their private affairs and concerns that would be highly offensive to a reasonable person, as a result of Defendant's uniform and wrongful conduct in intentionally disclosing their Private Purchase Information to Meta.

61. Plaintiff is an adequate representative of the Class because she is interested in the litigation; her interests do not conflict with those of the Class members she seeks to represent; she has retained competent counsel experienced in prosecuting class actions; and she intends to prosecute this action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of all Class members.

62. The class mechanism is superior to other available means for the fair and efficient adjudication of Class members' claims. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution

20

of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by this case's complex legal and factual issues. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication of the common questions of law and fact, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**CAUSE OF ACTION**
**Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710**

63.    Plaintiff repeats the allegations asserted in the preceding paragraphs as if fully set forth herein.

64.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

65.    As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual

materials[.]" Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it is engaged in the business of selling and delivering prerecorded video materials, similar to prerecorded video cassette tapes, to consumers nationwide.

66. As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or consumer of goods or services from a video tape service provider." As alleged above, Plaintiff and Class members are each a "consumer" within the meaning of the VPPA because they each purchased a subscription to access prerecorded video material or services from one of Defendant's Websites that was sold and delivered to them by Defendant.

67. As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." The Private Viewing Information that Defendant transmitted to Meta constitutes "personally identifiable information" as defined in 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and Class members to Meta as an individual who purchased, and thus "requested or obtained," a subscription to access prerecorded video content from one of Defendant's Websites.

68. Defendant knowingly disclosed Plaintiff's and Class members' Private Viewing Information to Meta via the Meta Pixel technology because Defendant

intentionally installed and programmed the Meta Pixel code on its Websites, knowing that such code would transmit the subscription purchased by its consumers and the purchasers' unique identifiers (including FIDs).

69.     Defendant failed to obtain informed written consent from Plaintiff or Class members authorizing it to disclose their Private Viewing Information to Meta or any other third party.   More specifically, at no time prior to or during the applicable statutory period did Defendant obtain from any person who purchased a subscription to access prerecorded video material or services on its Websites (including Plaintiff or Class members) informed, written consent that was given in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer, that was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner, or that was given after Defendant provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. *See* 18 U.S.C. § 2710(b)(2).

70.     By disclosing Plaintiff's and Class members' Private Viewing Information, Defendant violated their statutorily protected right to privacy in their Private Viewing Information.

71. Consequently, Defendant is liable to Plaintiff and Class members for damages in the statutorily set sum of $2,500. 18 U.S.C. § 2710(c)(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant Continued.com, LLC as follows:

a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

b) For an order declaring that Defendant's conduct as described herein violated the VPPA;

c) For an order finding in favor of Plaintiff and the Class and against Defendant on all counts asserted herein;

d) For an award of $2,500.00 to Plaintiff and each Class member, as provided by 18 U.S.C. § 2710(c);

e) For an order permanently enjoining Defendant from disclosing the Private Viewing Information of its subscribers to third parties in violation of the VPPA;

f) For prejudgment interest on all amounts awarded; and

g) For an order awarding punitive damages, reasonable attorneys' fees, and costs to counsel for Plaintiff and the Class under Rule 23 and 18 U.S.C. § 2710(c).

Respectfully submitted,

Dated: October 16, 2024

**O'CONNOR, HASELEY AND WILHELM, LLC**

/s/ Daniel J. O'Connor
Ohio Supreme Court No. 0091397
O'CONNOR, HASELEY AND WILHELM, LLC
470 West Broad Street, Suite 15, Columbus, OH 43215
Telephone:   (614)246-8840
doconnor@goconnorlaw.com

*Counsel for Plaintiff and Putative Class*

**HEDIN LLP**

Elliot O. Jackson*
Florida Bar No. 1034536
HEDIN LLP
1395 Brickell Ave., Suite 610
Miami, Florida 33131-3302
Telephone:   (305) 357-2107
Facsimile:    (305) 200-8801
ejackson@hedinllp.com

*Counsel for Plaintiff and Putative Class*

*Pro Hac Vice Application Forthcoming