# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **VICTORIA LOVETT, individually and on behalf of all others similarly situated,** | : | **CASE NO. 1:24-cv-00590** |
| | : | |
| | : | **Judge Douglas R. Cole** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CONTINUED.COM, LLC,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## DEFENDANT CONTINUED.COM, LLC'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

Defendant Continued.com, LLC ("Continued") moves to dismiss Plaintiff's First Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief may be granted. Plaintiff has not pleaded a viable claim under the Video Privacy Protection Act, 18 U.S.C. § 2710.

A supporting memorandum accompanies this motion.

Respectfully submitted,

*/s/ Beth A. Bryan*
Beth A. Bryan (0082076)
Dominic Bayer (0104319)
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202
Phone: (513) 357-9617
Fax: (513) 381-0205
bryan@taftlaw.com
dbayer@taftlaw.com

*Counsel for Defendant Continued.com, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| VICTORIA LOVETT, individually and on behalf of all others similarly situated, | : | CASE NO. 1:24-cv-00590 |
| | : | |
| | : | Judge Douglas R. Cole |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CONTINUED.COM, LLC, | : | |
| | : | |
| Defendant. | : | |
| | : | |

DEFENDANT CONTINUED.COM, LLC's MEMORANDUM IN SUPPORT
OF ITS MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

## INTRODUCTION AND SUMMARY

Defendant Continued.com, LLC ("Continued") respectfully submits this Motion to Dismiss Plaintiff Victoria Lovett's First Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). This motion follows the Court's prior order dismissing Plaintiff's original complaint without prejudice for failing to allege that Continued disclosed any "specific videos or content" watched by Plaintiff. (Doc. 14, Op. at 9.) Plaintiff has filed a First Amended Complaint that may have cured this particular pleading deficiency. (*See, e.g.*, Doc. 16, First Am. Compl. ¶¶ 3, 12, at PageID 123, 125.) But even after amendment, Plaintiff still fails to plausibly allege a claim under the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

Plaintiff's First Amended Complaint, like her original complaint, seeks to extend the VPPA far beyond its original scope. In an attempt to cash in on statutory damages, Plaintiff alleges, as have dozens of other plaintiffs across the country, that any website hosting video content is a "video tape service provider" under the VPPA and that a common marketing tool called the Meta Pixel violates the VPPA. But such allegations go far beyond the scope of the VPPA as originally understood.

The VPPA allows the "consumer" of a "video tape service provider" to bring a claim if the provider "knowingly" disclosed the consumer's "personally identifiable information." 18 U.S.C. § 2710(b)(1). A "video tape service provider" is a "person engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." *Id.* § 2710(a)(4). And "personally identifiable information" is that "which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* § 2710(a)(3).

Plaintiff's allegations are far removed from the VPPA's original scope. Plaintiff did not sue a video store that rented her VHS tapes or similar audio-visual materials–instead, she sued the operator of a website hosting educational videos. Nor does Plaintiff claim that Continued publicized her video-viewing history by name and in plain English–instead, she claims that it sent a data transmission of her video-viewing history in code to tech giant Meta, linked to her anonymized FID number. These allegations are leagues away from the privacy violations the VPPA prohibited and do not state a claim for a violation of the VPPA.

Like her original complaint, Plaintiff's First Amended Complaint fails to state a ripe or viable claim against Continued on which relief may be granted and should be dismissed under Fed. R. Civ. P. 12(b)(6). Since Plaintiff's claims are fatally deficient, the Court should dismiss Plaintiffs' First Amended Complaint, just as it dismissed her original complaint—but this time *with* prejudice.

## MATERIAL FACTUAL BACKGROUND

### A.    The Parties.

Plaintiff alleges that Continued "operates and maintains a family of Websites, where it sells video services that provide unlimited access to prerecorded video content on various topics such as Speech Pathology, Audiology, Physical Therapy, and Occupational Therapy." (Doc. 16, First Am. Compl. ¶ 15, at PageID 126.) Generally, licensed professionals use Continued's websites to satisfy their continuing education requirements. (*See id.* ¶¶ 43, 71, at PageID 135, 143.) Plaintiff does not suggest that users can access the websites' video content other than online, such as by requesting DVDs.

Plaintiff alleges that, around August 15, 2023, she registered and paid for a one-year subscription for "access to unlimited prerecorded videos" on SpeechPathology.com, one of the websites operated by Continued. (*Id.* ¶ 9, at PageID 124.) According to Plaintiff, she then used her

SpeechPathology.com subscription "to request and obtain pre-recorded videos." (*Id.* ¶ 10, at PageID 125.) Plaintiff does not claim that she used SpeechPathology.com to satisfy continuing education requirements—or even that she is a licensed speech pathologist.

**B.    The Meta Pixel.**

Plaintiff alleges that Continued uses the "Meta Pixel" on its websites. (*Id.* ¶¶ 2, 54, at PageID 122, 139.) According to Plaintiff, the Meta Pixel is a "unique string of code that companies can embed on their websites to monitor and track the actions taken by visitors to their websites and to report them back to Meta." (*Id.* ¶ 56, at PageID 140.) Meta, formerly known as Facebook, developed and owns the Pixel. (*Id.*)

Plaintiff alleges that Meta can identify a website's users, so long as they have a Facebook account, since the Pixel sends users' Facebook ID number ("FID") to Meta. (*Id.* ¶ 57, at PageID 140.) According to Plaintiff, a FID is "a unique sequence of numbers linked to a specific Meta profile." (*Id.* ¶ 3, at PageID 123.) Plaintiff alleges that Meta "then monetizes" the information transmitted by the Meta Pixel "by selling advertisers the ability to serve highly targeted advertisements." (*Id.* ¶ 69, at PageID 143.)

**C.    The Alleged Disclosures.**

According to Plaintiff, Continued "intentionally programmed its websites . . . to include a Meta Pixel." (*Id.* ¶ 75, at PageID 144.) When it installed the Pixel, Continued allegedly knew that it would automatically transmit its website subscribers' "Video Information" to Meta, along with their FIDs. (*See id.* ¶ 93, at PageID 150–51.) Plaintiff also alleges that, throughout this period, she "had a Meta account, a Meta profile, and an FID associated with such profile." (*Id.* ¶ 11, at PageID 125.) Plaintiff alleges that a "Meta profile" generally "identifies by name the specific person to whom the profile belongs (and also contains other personally identifying information about the person.)" (*Id.* ¶ 3, at PageID 123.) But Plaintiff does not specify whether her "Meta account"

3

publicly displays her name or other personal information (such as her email, home address, or social security number).

Plaintiff alleges that the Pixel "disclosed [her] Private Viewing Information (including her FID, the URL identifying the specific video service she purchased, and the specific titles of prerecorded videos she requested or obtained and their accompanying URL) to Meta." (*Id.* ¶ 14, at PageID 126.) Plaintiff claims she "never consented, agreed, authorized, or otherwise permitted" Continued "to disclose her Private Video Information to Meta." (*Id.* ¶ 13, at PageID 125.)

**D.    The Proposed Class.**

Plaintiff seeks to represent a class consisting of all persons who, during the two years before her complaint, bought a subscription to a website owned by Continued and used it to watch continuing education video courses while keeping a Meta account. (*Id.* ¶ 82, at PageID 146–47.)

## SUMMARY OF ARGUMENT

The Complaint should be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. A complaint must be dismissed if it lacks "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). The Court should "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). But the Court "need not accept as true legal conclusions or unwarranted factual inferences, and conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 276 (6th Cir. 2010) (internal quotation marks and citation omitted).

The VPPA prohibits a "video tape service provider" from "knowingly" disclosing to a third party the "personally identifiable information" of any "consumer." 18 U.S.C. § 2710(b). So to

4

bring a VPPA claim, a plaintiff must plausibly allege facts supporting three elements. First, that the defendant is a "video tape service provider." Second, that the plaintiff is a "consumer" of the "video tape service provider." And third, that the defendant "knowingly disclose[d]" the plaintiff's "personally identifiable information" without authorization. Plaintiff has failed to plausibly allege facts making a VPPA claim.

First, Plaintiff does not plausibly allege that Continued is a "video tape service provider." Plaintiff alleges that Continued operates continuing-education websites that host digital video content. But the VPPA's plain text and history make clear that the statute does not regulate videos available exclusively online. Congress enacted the VPPA to protect the privacy of people who rented movie tapes from video stores—not to regulate the whole world wide web. The VPPA's text makes this clear, covering only "prerecorded video cassette tapes" and "similar audio visual materials." Taken together, these terms encompass only physical objects containing video media–rather than ephemeral transmissions of video content, such as digital videos. Since Plaintiff failed to allege that Continued rents, sells, or delivers any physical objects containing audio-visual materials, she has not alleged that Continued is regulated by the VPPA. Allowing Plaintiff's suit to proceed would extend the VPPA's reach from video tape rentals to the whole Internet. The Court should refuse to expand the VPPA so radically beyond its original meaning.

Second, Plaintiff does not plausibly allege that Continued disclosed her "personally identifiable information." Plaintiff alleges that, every time she watched a SpeechPathology.com video, the Meta Pixel—a string of programming code—transmitted her FID number, the video webpage URL, and a variety of "event data" to Meta. Plaintiff asserts that this transmission constitutes her "personally identifying information." Not so. Courts have consistently held that a VPPA plaintiff must plausibly allege that the defendant's unauthorized disclosure would allow an

**ordinary person** to connect the plaintiff personally to specific videos she requested or obtained. Plaintiff's First Amended Complaint fails this test twice over. On the one hand, Plaintiff does not plausibly allege that her FID—an anonymized number—identifies her personally, because she fails to allege what personal information (if any) is publicly displayed on the Meta profile associated with her FID. On the other, Plaintiff does not plausibly allege how an ordinary person could decode the Pixel's code transmissions to identify her personal identity and SpeechPathology.com video-viewing history.

Finally, Plaintiff has failed to plausibly allege that any disclosure of her "personally identifiable information" was made with the required mens rea: knowledge. Plaintiff claims that Continued knew, when it installed the Meta Pixel on its websites, that the Pixel would transmit subscribers' purchase of a subscription along with their FID. But to satisfy the VPPA's mens rea requirement, a plaintiff must show that a defendant knew that both user- and video-identifying information it disclosed would be linked to reconstruct "personally identifiable information." Plaintiff does not plausibly allege that Continued knew that Meta (or anyone else) would pair her FID with her SpeechPathology.com video-viewing history to personally identify what specific videos she watched. So she cannot satisfy the VPPA's mens rea requirement.

## ARGUMENT

I. **Plaintiff Fails to State a VPPA Claim Because Continued Is Not a "Video Tape Service Provider."**

As a start, Plaintiff's complaint fails to plausibly allege that Continued is a "video tape service provider," which the VPPA defines as "any person, engaged in the business . . . of rental,

sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

Nearly forty years after the VPPA's enactment, some courts have simply assumed that websites hosting exclusively digital video content are "video tape service providers," because they provide consumers with "audio visual materials." *See, e.g.*, *Stark v. Patreon, Inc.*, 635 F. Supp. 3d 841, 851 (N.D. Cal. 2022).[1] But this broad reading ignores both the VPPA's text and its history.

This Court has an obligation to interpret the VPPA in line with its ordinary meaning when enacted in 1988, rather than to match present-day expectations. *See Niz-Chavez v. Garland*, 593 U.S. 155, 160 (2021); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) at 69 ("The ordinary-meaning rule is the most fundamental semantic rule of interpretation."). Reading the phrase "audio visual materials" in isolation betrays the ordinary-meaning rule by ignoring the statutory context that informed its meaning in 1988. *See Helvering v. Gregory*, 69 F.2d 809, 810–11 (2d Cir. 1934) (L. Hand, J.) ("[T]he meaning of a sentence may be more than that of the separate words, as a melody is more than the notes, and no degree of particularity can ever obviate recourse to the setting in which all appear, and which all collectively create.").

So does Continued qualify as a "video tape service provider?" 18 U.S.C. § 2710(a)(4) ("[A]ny person engaged in the business … of rental, sale, or delivery of *prerecorded video cassette tapes* or *similar audio visual materials*.") (emphases added). The first part is easy. Continued does not rent, sell, or deliver "prerecorded video cassette tapes"—rectangular plastic cartridges that

---

[1] Perhaps surprisingly, only a single court appears to have expressly considered whether the VPPA may not apply to exclusively-digital video content. *See In re Hulu Priv. Litig.*, No. 11-3764, 2012 WL 3282960, at *6 (N.D. Cal. 2012) (finding that it does, "[g]iven Congress's concern with protecting consumers' privacy in an evolving technological world.").

contain an audio-visual recording. Continued instead hosts digital video content on websites like SpeechPathology.com. (Doc. 16, First Am. Compl. ¶ 15, at PageID 126.)

But does Continued provide consumers with "audio visual materials" that are "similar" to "prerecorded video cassette tapes?" Dictionary definitions help clarify this phrase's ordinary meaning when Congress enacted the VPPA. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566–69 (2012). First, two things were "similar" when they had "the same substance or structure throughout." *Similar*, Oxford English Dictionary (2d ed. 1989). *See also Similar*, Black's Law Dictionary (5th ed. 1979) ("Nearly corresponding; resembling in many respects; somewhat like; having a general likeness."); *id.* (6th ed. 1990) (same). In turn, "materials" generally were things composed of physical matter. *Material*, The Random House College Dictionary (Rev. ed. 1988) ("The substance or substances of which a thing is made or composed"; alternatively, "Formed or consisting of matter; physical; corporeal").

Putting both definitions together reveals that only other physical objects containing audio-visual recordings are "*similar* audio visual *materials*" to "prerecorded video cassette tapes." Faced with this language, an ordinary person in 1988 would have listed only items like film reels and discs, physical objects performing the same function as "prerecorded video cassette tapes": allowing consumers to play a single, pre-recorded audiovisual recording.[2] To be sure, in 1988,

---

[2] If the Court is willing to consider such evidence, the VPPA's legislative history reinforces the text's plain meaning. The Senate Judiciary Committee's report listed three physical objects containing audio-visual recordings as examples of "similar audio visual materials": "laser discs, open-reel movies, [and] CDI technology." S. Rep. No. 100-599, at 12 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 4342-1, 4342-10. The report also emphasized the VPPA's focus on entities distributing physical objects audio-visual recordings by describing the Act as prohibiting "*video stores* from disclosing 'personally identifiable information.'" *Id.* at 6, *as reprinted* in 1988 U.S.C.C.A.N. at 4342-7 (emphasis added).

online video streaming was still back in the future. But other non-physical audio-visual transmissions did exist, from pre-recorded TV programming to movie theater screenings. And an ordinary person would have concluded that the VPPA didn't cover those either. *See Osheske v. Silver Cinemas Acquisition Co.*, 700 F. Supp. 3d 921, 925 (C.D. Cal. 2023) (finding that movie theaters are not "video tape service providers").

The contextual canon of *Noscitur a sociis* ("a word is known by the company it keeps") reinforces this reading. *Yates v. United States*, 574 U.S. 528, 543 (2015). This canon counsels interpreters "to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words." *Id.* (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)); *see also Reading Law* at 195 ("Associated words bear on one another's meaning."). Here, the canon suggests that "similar audio visual materials" is "appropriately read to refer, not to any" video content, including digital media, but "specifically to the subset" of "audio visual materials" that consumers can physically handle. *See Yates*, 574 U.S. at 544.

If the Court has any remaining doubts about the VPPA's scope, it should resolve them in Continued's favor. On the one hand, the VPPA is codified as a criminal statute with civil penalties,[3] so it must be construed strictly under the rule of lenity. *See Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004). On the other, the VPPA's title—"Wrongful disclosure of video tape rental or sale records," 18 U.S.C. § 2710—may be instructive. *See Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of the statute."). The title's exclusive focus on video tapes suggests

---

[3] The VPPA is codified under Title 18 of the United States Code, which covers "Crimes and Criminal Procedure."

the VPPA should not be read as an "all-encompassing" data privacy regulation covering intangible transmissions of video content quite unlike video cassette tapes. *Yates*, 574 U.S. at 540.

Applying the VPPA to the modern-day Internet is "akin to placing a square peg into a round hole." *Robinson v. Disney Online*, 152 F. Supp. 3d 175, 184 (S.D.N.Y. 2015) (cleaned up). Allowing claims like Plaintiff's would extend "the law to cover factual circumstances far removed from those that motivated its passage." *See In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 284 (3d Cir. 2016). This Court should refuse Plaintiff's invitation to do so, especially given the plain meaning of the VPPA's text.

Since Continued does not distribute "similar audio visual materials" to "prerecorded video cassette tapes," Plaintiff has failed to plausibly allege that Continued is a "video tape service provider" under the VPPA.[4]

## II. Plaintiff Fails to State a VPPA Claim Because She Does Not Plausibly Allege that the Pixel Transmitted her "Personally Identifiable Information."

Plaintiff's First Amended Complaint also fails because it does not plausibly allege that Continued "disclosed" her "personally identifiable information." The VPPA defines "personally identifiable information" as "information which identifies *a person* as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. §

---

[4] Plaintiff's failure to plausibly allege that Continued is a "video tape service provider" also dooms her claim she is a "consumer," which the VPPA defines as a "renter, purchaser, or subscriber of goods or services *from a video tape service provider*." 18 U.S.C. § 2710(a)(1) (emphasis added). Since Continued is not a "video tape service provider," Plaintiff cannot claim to have purchased goods or services from one. As the Sixth Circuit has recently explained, "the most natural reading, which accounts for the context of both definitions, shows that a person is a 'consumer' only when he subscribes to 'goods or services' in the nature of 'video cassette tapes or similar audio visual materials.'" *Salazar v. Paramount Glob.*, 133 F.4th 642, 650–51 (6th Cir. 2025) (quoting 18 U.S.C. §§ 2710(a)(1), (4)). And, as explained above, the online continuing education courses that Plaintiff allegedly accessed on SpeechPathology.com are neither "prerecorded video cassette tapes" nor "similar audio-visual materials."

2710(a)(3) (emphases added). This definition "suggests that the information disclosed by a video tape service provider must, at the very least, identify a *particular* person—not just an anonymous individual—and connect this particular person with his or her viewing history." *Robinson*, 152 F. Supp. 3d at 179. Although the Sixth Circuit has yet to weigh in, most Circuits have interpreted "personally identifiable information" along these lines to encompass only information that "readily permits an ordinary person to identify a particular individual as having watched certain videos." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (quoting *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 274 (3d Cir. 2016)); *see also Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 51 (2d Cir. 2025) (adopting this ordinary-person standard).

Turning to the First Amended Complaint, does it plausibly assert that the Meta Pixel's transmissions identified Plaintiff personally? No. Plaintiff does not allege that Continued disclosed her name, address, social security number, or any other direct personal identifier to Meta. Instead, Plaintiff alleges only that the Pixel's transmissions included her FID. (Doc. 16, First Am. Compl. ¶¶ 11, 14, 54, 73–77, at PageID 125–26, 139, 144–46.) But Plaintiff's FID is just a "sequence of numbers" that, by itself, does not reveal her identity any more than the number "4" reveals Mark Zuckerberg's. (*Id.* ¶¶ 3, 57 n.21, at PageID 123, 140.)

To be sure, Plaintiff also claims that a person in the know could use her FID to find her Meta account "by accessing the URL www.facebook.com/[unencryptedFID]/." (*Id.* ¶ 76, at PageID 144–45.) But this allegation cannot by itself establish a disclosure of Plaintiff's "personally identifiable information" for two main reasons.

For a start, Plaintiff does not allege that her Meta account contains any of her personal information, such as her name or email address. (*See id.* ¶¶ 8, 11, at PageID 124–5.) Under the facts alleged, the account could very well be a pseudonymous or "burner" account—or might be

11

set to "private," shielding any personal information from public display. Simply pleading that Plaintiff's FID was disclosed does not plausibly allege she was personally identified—absent an allegation that the FID linked to a Meta page containing Plaintiff's personal information (such as her name, email, or home address). *See, e.g.*, *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 720 (N.D. Cal. 2023); *Edwards v. Learfield Commc'ns*, 697 F. Supp. 3d 1297, 1307 (N.D. Fla. 2023). *But see Feldman v. Star Trib. Media Co., LLC*, 659 F. Supp. 3d 1006, 1020–21 (D. Minn. 2023). Plaintiff's generic allegations about the information on a typical Meta profile cannot substitute for specific allegations about her own profile. (*See* Doc. 16, First Am. Compl. ¶ 3, at PageID 123.) After all, while Plaintiff "alleges what sort of information *could* be included on a [Meta] profile," her First Amended Complaint simply contains "no allegation as to what information was *actually* included on [her Meta] profile nor how that information could used by a third party to identify" Plaintiff. *See Wilson v. Triller*, 598 F. Supp. 3d 82, 92 (S.D.N.Y. 2022) (emphasis added).[5]

Even if Plaintiff's Meta profile contained personal information, her First Amended Complaint still fails to plausibly allege that an *ordinary person* reviewing a Pixel transmission

---

[5] Although *Wilson* is the rare recent VPPA case not involving the Meta Pixel, it is still instructive here. The *Wilson* plaintiff alleged that social media application Triller disclosed her user ID to third parties, along with information about videos she watched on the application. *Wilson v. Triller*, 958 F. Supp. 3d 82, 92 (S.D.N.Y. 2022). But before it could learn a Triller user's identity, a third party would need to "pair" the user's Triller ID with "information from [her] Triller profile page, which may or may not contain various personal information about the user." *Id.* But the plaintiff failed to allege that her Triller profile contained any of her personal information—nor did she explain how a third party could use information on her profile to identify the plaintiff's identity. *Id.* As a result, the court found that the plaintiff failed to plausibly allege that Triller disclosed her "personally identifiable information." *Id. Wilson*'s rationale applies equally here, where Plaintiff alleged only what kind of information is generally included on Meta profiles, but failed to allege what information is actually available on her own Meta profile or how that information could be used to identify her personally.

would readily identify Plaintiff personally and her SpeechPathology.com video history. In Plaintiff's account, each Pixel transmission contains a bundle of information, including: (1) her FID; (2) the URL of the webpage triggering the transmission; and (3) a variety of "event data," including "Page View, Subscribe, 'Play' button click to intiate [sic] a video starting, and more." (*See* Doc. 16, First Am. Compl. ¶¶ 3, 54, 64–66, 75, at PageID 123, 139, 142, 144.) Plaintiff does not identify the format in which the Pixel transmits this data—likely because the Pixel, a "snippet of programming code," transmits data in code rather than in plain English. (*See id.* ¶ 2, at PageID 122.) Much less does Plaintiff explain how an ordinary person could decode a Pixel transmission or understand its significance. *See In re Nickelodeon*, 827 F.3d at 283 ("To an average person, an IP address or a digital code in a cookie file would likely be of little help in trying to identify an actual person.").

In a similar case, the Second Circuit concluded that identical allegations failed to plausibly allege that a Meta Pixel transmission "would, with little, or no extra effort, permit an ordinary recipient to identify [the plaintiff's] video-watching habits." *Solomon*, 136 F.4th at 54 (quoting *In re Nickelodeon*, 827 F.3d at 284). The Second Circuit's reasoning applies equally well here. For a start, Plaintiff's First Amended "Complaint lacks any detail about how an ordinary person might access the information" transmitted by the Pixel. *Id.* at 54. "But even assuming, *arguendo*, that an ordinary person could somehow gain access to the transmission, the Complaint is also devoid of any details about *how* an ordinary person would use [the] FID to identify" Plaintiff. *Id.* The simple allegation that the Pixel transmitted a user's FID, a mere "sequence of numbers" that is "embedded in many other lines of code," does not "plausibly allege that an ordinary person could identify" Plaintiff's real identity—even if an ordinary person could hypothetically find the FID buried in a transmission and use a web browser to pull up Plaintiff's Meta profile. *Id.* Like the Second Circuit,

this Court should conclude that the mere allegation that a Pixel transmitted a website user's FID and video-viewing history, without explaining how an ordinary person could decode the transmission, does not plausibly allege a disclosure of a user's "personally-identifying information."[6]

### III.     Plaintiff Fails to State a VPPA Claim Because She Has Not Adequately Alleged That Any Disclosure Was "Knowing."

Even if Plaintiff did adequately allege that Continued disclosed her "personally identifiable information," she has not sufficiently alleged that Continued disclosed the information "knowingly."

As a criminal statute with civil penalties, the VPPA includes a mens rea requirement: a disclosure of "personally identifiable information" must be made "knowingly." 18 U.S.C. § 2710(b)(1). To satisfy the VPPA's knowledge requirement, a plaintiff must plausibly claim that the defendant "actually knew that it was disclosing: 1) a user's identity; 2) the identity of the video material; and 3) the connection between the two." *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1097 (N.D. Cal. 2015); *accord Adams v. America's Test Kitchen*, LP, 680 F. Supp. 3d 31, 43 (D. Mass 2023); *Feldman v. Star Trib. Media Co. LLC*, 659 F. Supp. 3d 1006, 1019 (D. Minn. 2023); *Aldana v. GameStop, Inc.*, No. 22-CV-7063-LTS, 2024 WL 708589, at *9 (S.D.N.Y. Feb. 21,

---

[6] To be sure, one Circuit seems to have adopted a more expansive definition of "personally identifiable information." The First Circuit suggested that "personally identifiable information" extends to "information reasonably and foreseeably likely to reveal which . . . videos [the consumer] has obtained." *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016) (finding that an iPhone user's GPS coordinates and device identifier were "personally identifiable information"). This approach appears to expand the statutory definition of the term beyond its plain meaning, which is limited to "information which identifies a person." 18 U.S.C. § 2710(a)(3). But in any event, Plaintiff's First Amended Complaint fails even the First Circuit's test, since it includes no allegations suggesting that receipt of a Pixel transmission—a string of code including Plaintiff's anonymized numeric FID, which in turn *could* be used to locate a Meta profile that *could* contain Plaintiff's personal information—was "reasonably and foreseeably likely to reveal" Plaintiff's personal identity and video-viewing history. *Yershov*, 820 F.3d at 486.

2024); *Louth v. NFL Enters. LLC*, No. 1:21-cv-00405-MSM-PAS, 2022 WL 4130866, at *3 (D.R.I. Sept. 12, 2022).

Assuming that Continued disclosed Plaintiff's "personally identifiable information,"[7] Plaintiff has plausibly alleged that Continued had knowledge as to the first two elements. After all, her First Amended Complaint alleges that Continued intentionally installed the Meta Pixel on its websites "knowing that such code would transmit" customers' purchase of a subscription and "later the titles" of any videos they watched using the subscription, along with their FID. (Doc. 16, First Am. Compl. ¶ 93, at PageID 150–51.)

But Plaintiff has failed to allege Continued's knowledge of the third element, since her First Amended Complaint does not assert that Continued knew that Meta would combine Plaintiff's FID and SpeechPathology.com video-viewing history to identify her as the "person" who "requested or obtained specific video materials or services." 18 U.S.C. § 2710(a)(3).

Plaintiff alleges only that Continued knew that the Pixel would inform Meta of its users who subscribed to Continued websites, identified not by name but by FID. (Doc. 16, First Am. Compl. ¶ 93, at PageID 150–51.) But she does not assert that Meta (or any other person) actually personally identified her and connected her to videos she watched—much less that Continued knew that this alleged privacy violation would occur. Under the facts alleged by Plaintiff, Continued could reasonably believe it was transmitting anonymized information that Meta would use only for targeted advertising to Meta users like Plaintiff.

Consider *In re Hulu Priv. Litig.*, another Meta Pixel case where the plaintiffs claimed that Hulu knowingly disclosed their "personally identifiable information" by using the Pixel to transmit

---

[7] *But see supra* Section II.

their FIDs and watch-page information. 86 F. Supp. 3d at 1097–98. The court noted that the plaintiffs had to show that Hulu's knowledge covered "all three VPPA elements: the user's identity; the identity of the videos; and the connection between them (that is, the fact that the consumer has 'requested or obtained' the listed videos)." *Id.* at 1098. Knowing disclosure of "user and video identification" (such as FIDs and watch-page addresses) was not enough, absent knowledge of the connection between both. *Id.* The plaintiffs had to "prove that Hulu knew that Facebook might combine those discrete things to reconstruct" their "personally-identifiable information." *Id.* at 1099.

Plaintiff claims that Continued knowingly disclosed her FID in a bundle that also included her SpeechPathology.com subscription and video-viewing history. (Doc. 16, First Am. Compl. ¶ 93, at PageID 150–51.) But like the *Hulu* plaintiffs, Plaintiff does not claim that Continued knew that Meta (or anyone else) would connect these "discrete things" to identify her as having "requested or obtained" specific videos. *See In re Hulu Priv. Litig.*, 86 F. Supp. 3d at 1098. So Plaintiff has failed to plausibly assert that Continued "knowingly" disclosed her "personally identifiable information."

## **CONCLUSION**

For these reasons, this Court should dismiss Plaintiffs' Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

Respectfully submitted,

*/s/ Beth A. Bryan*
Beth A. Bryan (0082076)
Dominic Bayer (0104319)
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202
Phone: (513) 357-9617
Fax: (513) 381-0205
bryan@taftlaw.com
dbayer@taftlaw.com

*Counsel for Defendant Continued.com, LLC*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that a true and correct copy of the above was filed electronically on July 17, 2025. Notice of this filing will be sent to all parties through the Court's electronic filing system.

*<u>/s/ Beth A. Bryan</u>*