# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| **VICTORIA LOVETT, individually and on behalf of all others similarly situated,** | : | **CASE NO. 1:24-cv-00590** |
| | : | |
| | : | **Judge Douglas R. Cole** |
| **Plaintiff,** | : | |
| | : | |
| v. | : | |
| | : | |
| **CONTINUED.COM, LLC,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

# DEFENDANT CONTINUED.COM, LLC's REPLY IN SUPPORT
# OF ITS MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiff Victoria Lovett ("Plaintiff") continues her efforts to stretch the Video Privacy Protection Act ("VPPA") far beyond its text and the conduct Congress designed that statute to cover. She insists that internet website operators, like Defendant Continued.com, LLC ("Continued"), face immense civil liability under a statute enacted to prevent video rental stores from disclosing customers' rental history. Unlike Judge Bork's movie rental history that spurred the VPPA, Plaintiff's video-viewing history and personal information were not disclosed in a manner discernable by an ordinary person.

To start, Continued is not a "video tape service provider." The VPPA's plain meaning at enactment, which the 2012 amendments left undisturbed, did not encompass distributors of intangible digital video content like Continued. Rather than engage with the ordinary reading of VPPA's text, Plaintiff's Opposition relies on faulty dictionary definitions, a perfunctory textual analysis, and irrelevant legislative history. This Court should reject Plaintiff's ill-founded attempt to expand the VPPA far beyond its original meaning.

Second, Plaintiff has not plausibly alleged that Continued disclosed her "personally identifiable information." The information transmitted from Continued's webpage by the Meta Pixel would not allow an ordinary person to identify Plaintiff's video watching habits. Simply put, the Pixel's coded transmission would not lead an ordinary person, even one who somehow accessed the information, to link Plaintiff to her SpeechPathology.com video-watching history.

Finally, even if Continued had disclosed "personally identifiable information," Plaintiff has failed to allege that Continued did so "knowingly." Plaintiff failed to allege that Continued knew that Meta would pair her FID and SpeechPathology.com subscription as the person who requested or obtained specific video materials or services, rather than simply for targeted

advertising. Rather than pointing to specific allegations specifying such knowledge, Plaintiff tries to rely on her First Amended Complaint's generalized allegations that Continued knowingly installed the Pixel on SpeechPathology.com. None of that meets the VPPA's mens rea requirement.

**ARGUMENT**

**I.     Plaintiff Fails to State a VPPA Claim Because Continued Is Not a "Video Tape Service Provider."**

Under the VPPA, a "video tape service provider" is a "person engaged in the business . . . of rental, sale or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). Plaintiff contends that Continued qualifies as one because its website (SpeechPathology.com) hosts digital educational videos "similar to prerecorded video cassette tapes." (Doc. 16, First Am. Compl. ¶ 90 at PageID 149.) But although she pays lip service to the VPPA's ordinary meaning, Plaintiff's cursory textual analysis falls short. (Doc. 18, Opp. at PageID 178–82.)

For a start, Plaintiff uses a dictionary published more than a *decade* after the VPPA's enactment. (Doc. 18, Opp. at PageID 178 (quoting *Material*, Oxford English Dictionary (3d ed. 2001), online version March 2012).) But a dictionary from **2001** hardly provides a reliable guide to ordinary meaning in **1988**.[1] *See Garland v. Cargill*, 602 U.S. 406, 437 (2024)

---

[1] This 13-year time gap is particularly relevant here, where Plaintiff seeks to extend an analog-era statute to digital-era technology, given the profound transformation in digital technology that occurred during this period—especially as it relates to video materials. *See* Raphael Cohen-Almagor, *Internet History*, Int'l J. Technoethics, Apr. 2011, at 45, 54, 56 ("The mid-1990s were the years when the Internet established itself as the focal point for communication, information and business," so that by the early 2000s "the technology facilitated peer-to-peer file sharing networks, photo and video generation and sharing."); *see also The Internet Revolution: A Global Perspective* (Emmanuele Giovannetti, Mitsuhiro Kagami & Masatsugu Tsuji eds., 2003) ("Aided by the reduced cost and increased availability of computers and computer-related products, as well

("[C]ontemporaneous dictionary definitions" provide "some of the best evidence of [a statute's] contemporaneous understanding"); *Keen v. Helson*, 930 F.3d 799, 802 (6th Cir. 2019) ("When interpreting the words of a statute, contemporaneous dictionaries are the best place to start."). Indeed, the definition that Plaintiff employs does *not* even appear in the second edition of the very same dictionary, published in 1989. *See Material*, Oxford English Dictionary (2d ed. 1989). Instead, this edition, closer to the VPPA's 1988 enactment, defines "Material" in line with Continued's interpretation: "Of or pertaining to matter or body; formed or consisting of matter; corporeal," and "Concerned with or involving matter or corporeal substance, its presence, use or agency." *Id.*

Nor is Plaintiff's textual analysis much better. Plaintiff fails to engage with Continued's contextual reading of the provision, simply dismissing it out of hand as "archaic." (Doc. 18, Opp. at PageID 179–80.) Instead, Plaintiff mechanistically combines dictionary definitions, concluding that "'similar audio visual materials' means any prerecorded audio visual material that is almost the same as, but not identical to, prerecorded video cassette tapes." (*Id.* at PageID 179.) But Plaintiff asserts, without explaining, that this "includ[es] prerecorded audio visual content in digital form, regardless of the method of its delivery (on the internet or otherwise)"—hardly a self-evident proposition. (*Id.* at PageID 180.) Ultimately, Plaintiff fails to explain how or why an ordinary person in 1988 would consider a distributor of exclusively-digital video content a "video tape service provider," much less to rebut Continued's explanation to the contrary. (*See* Doc. 17, Mot. to Dismiss at PageID 161–65.)

---

as technological advances in telecommunications, online networks spread rapidly throughout the world over the late 1990s.").

Plaintiff's expansive reading also offends the "canon against surplusage," the principle "that 'every word and every provision is to be given effect [and that n]one should needlessly be given an interpretation that caused it to . . . have no consequence.'" *Nielsen v. Preap*, 586 U.S. 392, 414 (2019) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) at 174). Plaintiff claims that the VPPA covers all "prerecorded audio visual content . . . regardless of the method of its delivery"—in other words, *all* "audio visual materials." (Doc. 18, Opp. at PageID 180.) But this broad reading gives no effect to Congress's limiting reference to "prerecorded video cassette tapes."[2] 18 U.S.C. § 2710(a)(4).

Indeed, entities providing consumers with prerecorded video cassette tapes (say, Blockbuster) worked quite differently from the myriad websites now offering on-demand digital video transmissions. Plaintiff reads the only textual guidepost to the materials covered by the VPPA—prerecorded video cassette tapes—out of the statute. She instead inserts her preferred outcome that the VPPA covers all videos regardless of medium. That does not work. The VPPA's scope begins with prerecorded video cassette tapes and only extends to "similar" materials. At most, courts have only "*left open the possibility* that temporary or permanent exchange of digital 'audio visual materials' *might* be subject to the VPPA." *Osheske v. Silver Cinemas Acquisition Co.*, 132 F.4th 1110, 1113 n.3 (9th Cir. 2025) (emphasis added). If Congress wanted to unmoor the VPPA from prerecorded video cassette tapes, it would have done so (especially when amending the statute in 2012). Plaintiff cannot ignore the textual touchstone of video cassette tapes.

---

[2] Plaintiff's Opposition also fails to address the *Noscitur a Sociis* canon, the rule of lenity, or the VPPA's title—all of which militate against her expansive interpretation of "video tape service provider." (*See* Doc. 17, Mot. to Dismiss at PageID 164–65.)

4

So too with the mechanics of delivering a prerecorded video tape. When the VPPA was enacted, "the 'ordinary course' of [a] rental store's business would have included typical interactions between a customer and the store clerk, who in many cases would have accessed an individual customer's rental history, address, and other personal information during the checkout process." *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 625 (7th Cir. 2014). But in the internet era, users access digital videos directly through their phone or computer through code transmissions including anonymized user identifiers—without needing another human to process their request, much less access their personal information. A user's on-demand access of digital video transmissions is thus quite unlike the rental, sale, or delivery of "prerecorded video cassette tapes" and similar physical audio-visual recordings that the VPPA sought to regulate. As a result, Continued simply is not the kind of entity covered by the VPPA.

Plaintiff also cites irrelevant legislative history in an attempt to disturb the text's natural reading. For example, Plaintiff's Opposition quotes a floor speech by Senator Leahy, expounding on the Senator's personal fears about technology's threats to privacy. (Doc. 18, Opp. at PageID 181, quoting S. Rep. No. 100-599 at 1–4 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 4342-1, 4342-1–4.) But Senator Leahy's concerns are irrelevant to whether, under the VPPA as originally understood, a distributor of exclusively-digital video content is a "video tape service provider." Indeed, Plaintiff fails to acknowledge the relevant legislative history cited by Continued's Motion to Dismiss, which does bear on the meaning of "video tape service provider." (Doc. 17, Mot. to Dismiss at PageID 163 n.2, quoting S. Rep. 100-599, at 12 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 4342-1, 4342-10.) As Continued explained (and as Plaintiff failed to rebut) this legislative history only reinforces the text's plain meaning: that Congress intended the VPPA to cover only distributors of physical audio-visual recordings. (*Id.*)

5

What's more, Plaintiff insists that Congress amended the VPPA in 2012 "for the explicit purpose of bringing internet-based video and streaming services into the fold." (Doc. 18, Opp. at PageID 180.) Not so. As Plaintiff herself admits, the "2012 amendment, however, left the definition of 'videotape service provider' untouched." (*Id.* at PageID 181.) Absent a change to this definition, the 2012 amendments could not have expanded the scope of entities regulated by the VPPA beyond the scope from its 1988 enactment.

Aside from legislative history, Plaintiff cannot explain why Congress' decision to keep the VPPA's text limited to videotape service providers means that all internet videos now fall under the VPPA's reach. (*Id.* at PageID 180–82.) In 2012, Congress could have easily updated the phrase "videotape service provider" to cover digital videos, streaming services, and internet user data. But it did not. *See Solomon v. Flipps Media Inc., Inc.*, 136 F.4th 41, 53 (2d Cir. 2025). Plaintiff's reliance on legislative history betrays her argument; the VPPA's text, even as amended, simply does not apply to online video providers like Continued.

In sum, Plaintiff dismisses the VPPA's text as "archaic." (Doc. 18, Opp. at PageID 178.) Instead, she relies instead on anachronistic dictionary definitions, irrelevant legislative history, and non-binding precedent. But the VPPA's clear text controls: Continued does not deliver "prerecorded video cassette tapes" or "similar audiovisual materials," so it is not a "video tape service provider."

## II. Plaintiff Fails to State a VPPA Claim because the Meta Pixel Transmitted No "Personally Identifiable Information" from Continued's Website.

Plaintiff's First Amended Complaint also fails to allege that Continued disclosed her "personally identifiable information." The VPPA defines "personally identifiable information" as "information which identifies *a person* as having requested or obtained *specific* video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3) (emphases added). Here, the

6

Meta Pixel transmissions alleged in Plaintiff's First Amended Complaint do not qualify as personally identifiable information.

As Plaintiff acknowledges, there is a Circuit split over what qualifies as "personally identifiable information" under the VPPA. (Doc. 18, Opp. at PageID 183.) Although the Sixth Circuit has yet to weigh in, most circuits to address the issue—the Second, Third, and Ninth— have adopted an ordinary-person standard. In other words, the VPPA "applies only to the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior.*" In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 267 (3d Cir. 2016). Only the First Circuit has taken a different approach, finding information "personally identifiable" if it is reasonable and foreseeable that its disclosure is likely to reveal which videos a customer has requested or obtained. *See Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016). This Court should follow the majority of Circuit court decisions and apply the ordinary-person test. But no matter which side of the split this Court follows, Plaintiff has failed to state a claim.

Start with *Solomon*, 136 F.4th at 53–55. This recent Second Circuit decision explains exactly why similar claims involving the Meta Pixel cannot succeed under the VPPA. There, the Second Circuit affirmed the dismissal of a similar Meta Pixel claim under the VPPA because the "Complaint [was] devoid of any details about *how* any ordinary person use an FID" to "identify" plaintiff and her video-viewing history. *Id.* at 53. The *Solomon* court reasoned that an ordinary person could not readily understand that the lines of code the Pixel transmitted to Meta provided information that *could* be used to identify a particular person as having watched certain website videos. *Id.* at 54–55. Under *Solomon*'s logic, Plaintiff's claims cannot survive the ordinary-person

7

test used by most Circuits. No ordinary person would look at the code transmitted by the Pixel and link Plaintiff to her SpeechPathology.com video-viewing history.

Even so, Plaintiff tries distinguish her claims from *Solomon*. (Doc. 18, Opp. at PageID 189–91.) First, Plaintiff points out that *Solomon* is not binding. (*Id.* at PageID 189.) Fair enough. But the Sixth Circuit has not addressed this issue, so no precedent binds this Court.[3] And *Solomon* provides the rule most consistent with the VPPA's text and plain meaning: if an ordinary person would not readily use the disclosed information—such as a Pixel transmission—to link a user with her video-viewing history, then no "personally identifiable information" has been disclosed under the VPPA.

Next, Plaintiff claims that *Solomon* "conflicts with every other Circuit's interpretation of the phrase 'personally identifiable information,'" including those from Circuits using the ordinary-person test. (*Id.*) Plaintiff claims that *Solomon* is an outlier because it supposedly "leaves no room for numerical identifiers in tracking technology cases to ever support a VPPA claim." (*Id.*) But none of the cases cited in Plaintiff's brief supports her proposition. (*Id.*) They simply leave open the possibility that GPS coordinates, customer IDs, Facebook links, and email addresses could identify a user *if* disclosed in a way that would alert an ordinary person that they could be used to link a particular person to their video-viewing history. (*Id.*) And no case explains how an ordinary

---

[3] Plaintiff makes frequent reference to a Report and Recommendation by Magistrate Judge Litkovitz, subsequently adopted by this Court in *Haines v. Cengage Learning, Inc.*, No. 1:24-cv-710, 2025 WL 2045644 (S.D. Ohio July 22, 2025). To be sure, the Magistrate Judge considered whether the VPPA covers a disclosure of private viewing information to Meta. *Id.* at *2. But this Court's *Haines* decision is inapposite because it applied a different standard than the one here. Rather than straightforwardly considering arguments in a motion to dismiss, this Court simply concluded that the defendant had failed to "point to any specific finding as erroneous beyond re-arguing the same statements it made throughout briefing and oral argument," barring her from objecting to the Report and Recommendation. *Id.*

person could look at the FID data transmitted by the Meta Pixel and learn anything about the person who watched a video. So *Solomon* got it exactly right, and aligns with the ordinary-person standard—transmissions of inscrutable code, with no context, are not enough for an ordinary person to gain information about the user. Nothing in the First Amended Complaint, or the cases cited by Plaintiff, explains how an ordinary person could take the information transmitted here and learn anything connecting Plaintiff's identity with the videos she watched.

Equally unavailing, Plaintiff relies on the VPPA's "purpose" and legislative history to resist *Solomon*'s conclusion. (*Id.* at PageID 190.) She contends that Congress "intended" that "modern data collection practices" should not be immunized from liability. (*Id.*) But even if that were true, it would be no reason to discard *Solomon*'s textual analysis. (*Id.*) *Solomon* acknowledged that the VPPA's use of the words "include" and "identifiable" "suggest that personally identifiable information includes information *that can be used* to identify a person"— but not when "only a sophisticated technology company could use" the information to identify a consumer's video-viewing habits. 136 F.4th at 52. Plaintiff's arguments about the VPPA's purpose cannot overcome the text's clear and unambiguous meaning. *Moats v. Comm'r of Social Security*, 42 F. 4th 558, 566 (6th Cir. 2022) (Readler, J., concurring) ("More to the point, we may not elevate a statute's ostensible purpose over its text." (collecting cases)).

Even if this Court considered the VPPA's purpose, *Solomon* correctly points out that the VPPA responded to concerns about a video store clerk leaking Judge Bork's video tape rental history—not to concerns over whether "a third party" could "assemble otherwise anonymous pieces of data to unmask the identity of individual users.'" 136 F.4th at 43, 54. For that reason, the analysis in *Solomon* is most loyal to the VPPA's original goal of preventing video tape rental companies from making public disclosures about customer viewing history. And despite its 2012

amendments to the VPPA, Congress has "declined to amend the definition of personally identifiable information, even in the face of testimony asking for an expansion of the definition to include IP addresses." *Id.* at 53. Congress' inaction neuters Plaintiff's reliance on legislative history to suggest a sea change for the VPPA's scope. All told, Plaintiff fails to explain why this Court should depart from *Solomon* and other decisions applying the ordinary person test.

Should this Court favor the First Circuit's reasonable and foreseeable standard, it should still grant dismissal. The First Circuit suggested that "personally identifiable information" extends to "information reasonably and foreseeably likely to reveal which . . . videos [the consumer] has obtained." *Yershov*, 820 F.3d at 486. Because Plaintiff gives no explanation about how a Meta Pixel transmission could reasonably or foreseeably uncover Plaintiff's identity and video-viewing history, Plaintiff has failed to state a claim under *Yershov*.

Finally, Plaintiff's complaint omits necessary allegations about personal information related to her Facebook account. In *Wilson v. Triller*, 598 F. Supp. 3d 82, 92 (S.D.N.Y. 2022), the court granted dismissal because the complaint made "no allegation as to what information was *actually* included on [the Facebook] profile nor how that information could used by a third party to identify" the plaintiff. In other words, the *Wilson* plaintiff did not state a claim under the VPPA because she failed to allege a link between the her social media account, the information available on that account, and her video-watching history. *Id.*

So even if an ordinary person could access Plaintiff's Meta profile through her FID, Plaintiff still needed to specify the information available on the social media page. Here, Plaintiff only states that she "had a Meta account, a Meta profile, and an FID associated with such profile." (Doc. 16, First Am. Compl. ¶ 91 at PageID 125.) Although a person must provide "his or her first and last name, birth date, gender, and phone number or email address" to "create a Meta Profile,"

10

the First Amended Complaint does not state that Plaintiff had such information visible on her Profile, if that information was accurate, whether Plaintiff used privacy settings, or how that information could be used to identify her. (*See id.* ¶ 55 at PageID 139–40.) Those omissions are fatal.

Plaintiff tries to distinguish *Wilson* simply because that case "did not involve the Meta Pixel, and the information disclosed was anonymized." (Doc. 18, Opp. at PageID 188.) That argument falls short. *Wilson* outlines the type of personally identifiable information that must be accessible from a social media page for a VPPA claim to survive dismissal. Whether claims involve a Meta profile, a Tiktok account, or eBay page is irrelevant—what matters under the VPPA is the information disclosed and what can be done with it. Viable claims under that statute must contain allegations detailing "what information was actually included on [the user's] profile" and how a social media user's information "could be used by a third party to identify" them. *Wilson*, 598 F. Supp. 3d at 92. Plaintiff's First Amended Complaint does not contain such allegations. That is why she presents only a brief and conclusory argument that "*Wilson* is irrelevant." (Doc. 18, Opp. at PageID 188.)

For all the reasons above, the Court should dismiss Plaintiff's First Amended Complaint for failing to allege disclosure of personally identifiable information.

### III. Plaintiff Failed to Meet the VPPA's Mens Rea Requirement of a "Knowing" Disclosure.

Finally, even if Plaintiff plausibly alleged that Continued disclosed Plaintiff's "personally identifiable information," Plaintiff fails to plausibly allege that the disclosure was "knowing."

The VPPA provides that only a "video tape service provider who *knowingly* discloses . . . personally identifiable information . . . shall be liable to the aggrieved person." 18 U.S.C. § 2710(b)(1) (emphasis added). To satisfy the VPPA's knowledge requirement, a plaintiff must

11

plausibly claim that the defendant "actually knew that it was disclosing: 1) a user's identity; 2) the identity of the video material; and 3) the connection between the two." *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1097 (N.D. Cal. 2015); *accord Adams v. America's Test Kitchen, LP*, 680 F. Supp. 3d 31, 43 (D. Mass 2023); *Feldman v. Star Trib. Media Co. LLC*, 659 F. Supp. 3d 1006, 1019 (D. Minn. 2023); *Aldana v. GameStop, Inc.*, No. 22-CV-7063-LTS, 2024 WL 708589, at *9 (S.D.N.Y. Feb. 21, 2024); *Louth v. NFL Enters. LLC*, No. 1:21-cv-00405-MSM-PAS, 2022 WL 4130866, at *3 (D.R.I. Sept. 12, 2022).

Assuming that Continued disclosed Plaintiff's "personally identifiable information,"[4] Plaintiff has plausibly alleged that Continued had knowledge as to the first two elements. But Plaintiff has failed to allege Continued's knowledge of the third element, since her Complaint does not assert that Continued knew that Meta would combine Plaintiff's Speech Pathology.com subscription and FID to identify her as the "person" who "requested or obtained specific video materials or services." 18 U.S.C. § 2710(a)(3). (*See* Doc. 17, Mot. to Dismiss at PageID 170.)

Plaintiff's Opposition does not challenge that she needs to prove all three elements. (Doc. 18, Opp. at PageID 191–93.) Nor does it point to any allegations relevant to Continued's knowledge of the third element. (*Id.*) Plaintiff merely cites snippets of her First Amended Complaint that address Continued's general knowledge about the Pixel. (*Id.*) But Plaintiff conspicuously fails to directly address Continued's argument that the "First Amended Complaint does not assert that Continued knew that Meta would combine Plaintiff's FID and SpeechPathology.com video-viewing history to identify her as the 'person' who 'requested or obtained specific video materials or services.'" (*See* Doc. 17, Mot. to Dismiss at PageID 170.)

---

[4] *But see supra* Section II.

12

Instead, Plaintiff asserts only that her allegations show Continued's knowledge that it was "installing and utilizing the Meta Pixel to systematically disclose all of its subscribers' personally identifiable information to Meta." (Doc. 18, Opp. at PageID 193.) Missing is any argument that the allegations show that Continued knowingly disclosed a connection between Plaintiff's identity and the video material.

Plaintiff also fails to distinguish *Hulu*, aside from observing the differing procedural postures, which does not change the analysis, and offering a conclusory statement that relying on *Hulu* is "baseless."(Doc. 18, Opp. at PageID 191.) Yet *Hulu* is directly on point. That case explains why the knowing mens rea requirement matters for VPPA claims in the digital context. "The nature of the third element—the connection—distances this Internet-streaming case from the situations for which the VPPA was enacted." *Hulu,* 86 F. Supp. 3d at 1096. Because website operators like Continued do not know that Meta "might combine the c_user and watch-page data to construct information that would identify a user 'as having requested or obtained specific video materials or services . . . there is no knowing disclosure of PII." *Id.* at 1099. For that reason, Plaintiff's VPPA claim falls short. Without allegations that Continued knew what "Facebook would do with the user-identifying information . . . on the one hand, and, on the other, the video title that could be gleaned from watch-page addresses," Plaintiff has failed to state a "knowing" disclosure of personally identifiable information. *Id.*

What's more, *Hulu* proves faithful to how the Supreme Court reads similar statutory mens rea requirements. More than once, the Supreme Court has "held that a word such as 'knowingly' modifies not only the words directly following it, but also those other statutory terms that 'separate wrongful from innocent acts.'" *Ruan v. United States*, 597 U.S. 450, 458 (2022) (quoting *Rehaif v. United States*, 588 U.S. 225, 232 (2019)). Applied to the VPPA, this insight confirms that

13

"knowingly" modifies not only the term "discloses," but also the term "personally identifiable information." 18 U.S.C. § 2710(b)(1). So given the VPPA's definition of "personally identifiable information," a VPPA plaintiff must show that a video tape service provider knew it was sharing information that "identifie[d]" the plaintiff "as having requested or obtained specific video materials or services." *Id.* § 2710(a)(3). Such knowledge is what "separate[s] wrongful" disclosures that a video tape service provider knows will lead to privacy violations from "innocent" disclosures of anonymized data. *See Rehaif*, 588 U.S. at 232. This Court should follow the Supreme Court's lead and refuse to read the term "knowingly" in the VPPA to allow a claim, like Plaintiff's, that threatens liability for "an innocent mistake to which criminal sanctions do not normally attach." *Id.*[5]

For these reasons, Plaintiff has failed to plausibly allege that the disclosure of "personally-identifiable information" by Continued was "knowing."

## CONCLUSION

For these reasons, this Court should dismiss Plaintiffs' Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

---

[5] The rule of lenity also supports applying the knowledge requirement to all elements, given that the VPPA is a criminal statute with civil penalties. *See Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004). Plaintiff makes no argument against applying the rule of lenity here.

Respectfully submitted,

*/s/ Beth A. Bryan*
Beth A. Bryan (0082076)
William E. Braff (0098773)
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202
Phone: (513) 357-9617
bryan@taftlaw.com
bbraff@taftlaw.com

*Counsel for Defendant Continued.com, LLC*

**CERTIFICATE OF SERVICE**

The undersigned certifies that a true and correct copy of the above was filed electronically on August 1, 2025. Notice of this filing will be sent to all parties through the Court's electronic filing system.

*/s/ Beth A. Bryan*