**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **VICTORIA LOVETT, individually and on behalf of all others similarly situated,** | : : | **CASE NO. 1:24-cv-00590** |
| | : | **Judge Douglas R. Cole** |
| **Plaintiff,** | : | |
| v. | : | |
| | : | |
| **CONTINUED.COM, LLC,** | : | |
| | : | |
| **Defendant.** | : | |

**DEFENDANT CONTINUED.COM, LLC's ANSWER TO**
**PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT**

For its Answer to Plaintiff Victoria Lovett's ("Ms. Lovett") First Amended Class Action

Complaint (Doc. 16), Defendant Continued.com LLC ("Continued") states as follows:

## NATURE OF THE CASE

1.      Plaintiff brings this action to redress Defendant Continued.com, LLC's

("Continued") practices of knowingly disclosing Plaintiff's and its other customers' identities,

their purchases of a specific video service that grants them access to prerecorded video content,

and the specific titles of prerecorded videos requested or obtained to Meta Platforms, Inc.

("Meta"), formerly known as Facebook, Inc. ("Facebook"), in violation of the federal Video

Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710 et seq.

> **ANSWER: The allegations in Paragraph 1 state a legal conclusion and are summary in nature, to which a response is not required. To the extent a response is required, Continued denies the allegations in Paragraph 1. Continued further avers that it is a continuing education provider whose subscription services encompass a range of educational modalities, including live interactive courses, audio-only courses, and text-based coursework. Continued denies that it is merely a provider of "prerecorded video content" or a "video service" as characterized by Plaintiff.**

2.      Over the past two years, Defendant has systematically transmitted (and continues to transmit today) its customers' personally identifying video viewing information to Meta using a snippet of programming code called the "Meta Pixel," which Defendant chose to install and configure on its family of websites that include but are not limited to: www.speechpathology.com, www.occupationaltherapy.com, www.audiologyonline.com, and www.physicaltherapy.com (collectively, "Websites").

**ANSWER: Admit that the Meta Pixel had been installed on one or more websites maintained by Continued and that website user data can be transmitted through the Meta Pixel. Continued denies the remaining allegations.**

3.      The information Defendant disclosed (and continues to disclose) to Meta via the Meta Pixel includes the customer's Facebook ID ("FID"), the specific video service that each of its customers purchased on any one of its Websites, and the specific title of every video (prerecorded or not) requested or obtained using that service. An FID is a unique sequence of numbers linked to a specific Meta profile. A Meta profile, in turn, identifies by name the specific person to whom the profile belongs (and also contains other personally identifying information about the person). Entering "Facebook.com/[FID]" into a web browser returns the Meta profile of the person to whom the FID corresponds. Thus, the FID identifies a person more precisely than a name, as numerous persons may share the same name, but each person's Facebook profile (and associated FID) uniquely identifies one and only one person. In the simplest terms, the Meta Pixel installed by Defendant captures and discloses to Meta information that reveals a particular person purchased a video service from Defendant's Websites that provided them total access to prerecorded videos and further reveals the title of every video requested or obtained using that service (hereinafter, "Private Video Information").

**ANSWER: Admit that the Meta Pixel can share certain user data collected from websites operated by Continued. Continued denies the remaining allegations in**

2

**Paragraph 3, including the characterization of Continued's subscription services as a "video service" and the characterization that its subscriptions provide "total access to prerecorded videos." Continued's subscription services provide access to continuing education content delivered through multiple modalities approved by the credentialing agencies for licensed professionals, including live courses, audio courses, and text-based materials, and Continued denies that the term "Private Video Information" accurately describes any information associated with its subscribers.**

4.      Defendant disclosed and continues to disclose its customers' Private Video Information to Meta without asking for, let alone obtaining, their consent to these practices.

**ANSWER: Denied.**

5.      The VPPA clearly prohibits what Defendant has done. Subsection (b)(1) of the VPPA provides that, absent the consumer's prior informed, written consent, any "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for," 18 U.S.C. § 2710(b)(1), damages in the amount of $2,500.00, see id. § 2710(c).

**ANSWER: The allegations in Paragraph 5 state a legal conclusion to which a response is not required. To the extent a response is required, Continued denies the allegations in Paragraph 5.**

6.      Accordingly, on behalf of herself and the putative Class members defined below, Plaintiff brings this first amended class action complaint against Defendant for intentionally and unlawfully disclosing her and the Putative Class members' Private Video Information to Meta.

**ANSWER: The allegations in Paragraph 6 state a legal conclusion to which a response is not required. To the extent a response is required, Continued denies the allegations in Paragraph 6.**

<u>PARTIES</u>

**I.      Plaintiff Victoria Lovett**

7.      Plaintiff is, and at all times relevant hereto was, a citizen and resident of Brooks County, Georgia.

3

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 7.**

8.      Plaintiff is, and at all times relevant hereto was, a user of Meta.

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 8.**

9.      Plaintiff is a consumer of the video products and services offered on Defendant's www.speechpathology.com website. She purchased a specific video service from Defendant's website on or about August 15, 2023, which provided her access to unlimited prerecorded videos for a one-year period. Plaintiff maintained her subscription throughout the term of the plan selected. Plaintiff became a subscriber to Defendant's website by registering and paying for a video service and providing her email address, payment information, and zip code.

**ANSWER: The allegations in Paragraph 9 state a legal conclusion to which a response is not required. To the extent a response is required, Continued admits that Ms. Lovett maintained a subscription with Continued to access continuing education materials on its website, that Ms. Lovett paid for Continued's services, and that Ms. Lovett provided Continued an email address, payment information, and zip code. Continued denies that Ms. Lovett purchased a "video service" or that her subscription provided "access to unlimited prerecorded videos." Ms. Lovett's subscription provided access to continuing education content delivered through multiple modalities, including live courses, audio courses, and text-based materials. Continued denies the remaining allegations in Paragraph 9.**

10.      On multiple occasions during the two years preceding the filing of this action, Plaintiff used her video service from Defendant's website to request and obtain pre-recorded videos from Defendant.

**ANSWER: Denied. Continued's records do not reflect that Ms. Lovett requested or obtained prerecorded video content on Continued's websites during the applicable statutory period.**

11.      At all times relevant hereto, including when purchasing a video service on Defendant's website and using that service to request and obtain prerecorded video material

4

provided to subscribers on Defendant's website, Plaintiff had a Meta account, a Meta profile, and an FID associated with such profile.

> **ANSWER: Denied that Ms. Lovett used Continued's website to request or obtain prerecorded video materials during the applicable statutory period. Continued denies for lack of knowledge whether Ms. Lovett had a Meta account or other social media connected with a subscription to a website maintained by Continued. Continued denies the remaining allegations in Paragraph 11.**

12. When Plaintiff purchased her video service and accessed prerecorded videos from Defendant's website using that service, Defendant disclosed to Meta Plaintiff's FID, the URL identifying the specific video service she purchased, and the title of the specific videos she requested or obtained (and URLs where they are available) using that service among other information about Plaintiff and the device she used to make the purchase.

> **ANSWER: Denied.**

13. Plaintiff has never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Private Video Information to Meta. In fact, Defendant has never even provided Plaintiff with written notice of its practices of disclosing its customers' Private Video Information to third parties such as Meta.

> **ANSWER: Denied.**

14. Because Defendant disclosed Plaintiff's Private Video Information (including her FID, the URL identifying the specific video service she purchased, and the specific titles of prerecorded videos she requested or obtained and their accompanying URL) to Meta during the applicable statutory period, Defendant violated Plaintiff's rights under the VPPA and invaded her statutorily conferred interest in keeping such information (which bears on her personal affairs and concerns) private.

5

**ANSWER: The allegations in Paragraph 14 state a legal conclusion to which a response is not required. To the extent a response is required, Continued denies the allegations in Paragraph 14.**

**II.      Defendant Continued.com, LLC**

15.      Defendant is a foreign limited liability company organized under the laws of the State of Texas. Defendant operates and maintains a family of Websites, where it sells video services that provide unlimited access to prerecorded video content on various topics such as Speech Pathology, Audiology, Physical Therapy, and Occupational Therapy.

**ANSWER: Admit that Continued is a foreign limited liability company organized under the laws of the State of Texas. Admit that Defendant operates and maintains a family of websites on which it sells subscription to access continuing education materials. Continued denies that it "sells video services that provide unlimited access to prerecorded video content." Continued's subscription services provide access to a comprehensive library of continuing education content delivered through multiple modalities, including live interactive courses, audio-only courses, and text-based coursework and materials approved by the credentialing agencies for licensed professionals. Continued denies the remaining allegations in Paragraph 15.**

### JURISDICTION AND VENUE

16.      The Court has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2710.

**ANSWER: The allegations in Paragraph 16 state a legal conclusion to which a response is not required.**

17.      Personal jurisdiction and venue are proper because a substantial portion of Defendant's maintenance, use, and operation of its family of Websites occurs in Hamilton County, within this judicial District.

**ANSWER: The allegations in Paragraph 17 state a legal conclusion to which a response is not required.**

6

## VIDEO PRIVACY PROTECTION ACT

18. The VPPA prohibits companies (like Defendant) from knowingly disclosing to third parties (like Meta) information that personally identifies consumers (like Plaintiff) as having viewed particular videos or other audio-visual materials.

> **ANSWER: The allegations in Paragraph 18 state a legal conclusion to which a response is not required. To the extent a response is required, Continued denies the allegations in Paragraph 18. Continued further denies that it is a "video tape service provider" subject to the VPPA, as it is primarily a continuing education provider offering materials in multiple formats. Continued further denies that Ms. Lovett has viewed videos or other audio-visual materials on Continued's website during the relevant period.**

19. Specifically, subject to certain exceptions that do not apply here, the VPPA prohibits "a video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider[.]" 18 U.S.C. § 2710(b)(1). The statute defines a "video tape service provider" as "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4). It defines a "consumer" as "a renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). "'[P]ersonally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

> **ANSWER: The allegations in Paragraph 19 state a legal conclusion to which a response is not required. To the extent a response is required, Continued denies the allegations in Paragraph 19. Continued specifically denies that it is a "video tape service provider" as defined by 18 U.S.C. § 2710(a)(4), as Continued is not "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." Continued is engaged in the business of providing continuing education through multiple content modalities, approved by the credentialing agencies for licensed professionals.**

20. Leading up to the VPPA's enactment in 1988, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal

information without having any control over where that information goes." Id. Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials because such records offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

> **ANSWER: The allegations in Paragraph 20 state a legal conclusion to which a response is not required. To the extent a response is required, Continued denies the allegations in Paragraph 20.**

21. Thus, in proposing the Video and Library Privacy Protection Act (which later became the VPPA), Senator Patrick J. Leahy (the senior Senator from Vermont from 1975 to 2023) sought to codify, as a matter of law, that "our right to privacy protects the choice of movies that we watch with our family in our own homes." 134 Cong. Rec. S5399 (May 10, 1988). As Senator Leahy explained at the time, the personal nature of such information, and the need to protect it from disclosure, is the raison d'être of the statute: "These activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

> **ANSWER: The allegations in Paragraph 21 state a legal conclusion to which a response is not required. To the extent a response is required, Continued denies the allegations in Paragraph 21.**

22. While these statements rang true in 1988 when the act was passed, the importance of legislation like the VPPA in the modern era of data mining is more pronounced than ever before. During a more recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act:

8

Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[1]

> **ANSWER: The allegations in Paragraph 22 state a legal conclusion to which a response is not required. To the extent a response is required, Continued denies the allegations in Paragraph 22.**

23.     Former Senator Al Franken may have said it best: "If someone wants to share what they watch, I want them to be able to do so . . . But I want to make sure that consumers have the right to easily control who finds out what they watch—and who doesn't. The Video Privacy Protection Act guarantees them that right."[2]

> **ANSWER: Admit that Senator Al Franken made the statement in Paragraph 23. To the extent Paragraph 23 states a legal conclusion, Continued needs not respond to the allegations in Paragraph 23.**

24.     In this case, however, Defendant deprived Plaintiff and numerous other similarly situated persons of that right by systematically (and surreptitiously) disclosing their Private Video Information to Meta, without providing notice to (let alone obtaining consent from) any of them, as explained in detail below.

> **ANSWER: Denied.**

## BACKGROUND FACTS

**I.     Consumers' Personal Information Has Real Market Value**

---

[1] The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary.senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21stcentury.

[2] Chairman Franken Holds Hearing on Updated Video Privacy Law for 21st Century, franken.senate.gov (Jan. 31, 2012).

25.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[3]

> **ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 25. Further, the allegations in Paragraph 25 are summary in nature and require no response.**

26.     Over two decades later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a 26 billion dollar per year online advertising industry in the United States.[4]

> **ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 26. Further, the allegations in Paragraph 26 are summary in nature and require no response.**

27.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the great potential for analysis – and profit.[5]

> **ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 27. Further, the allegations in Paragraph 27 are summary in nature and require no response.**

---

[3] Transcript, The Information Marketplace (Mar. 13, 2001), at 8-11, available at https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

[4] *See* Julia Angwin and Emily Steel, *Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb. 28, 2011), available at https://www.wsj.com/articles/SB10001424052748703527487035290045761607640379220274.

[5] Statement of FTC Cmr. Harbour (Dec. 7, 2009), at 2, available at https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf

28.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers. Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[6]

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 28. Further, the allegations in Paragraph 28 are summary in nature and require no response.**

29.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[7]

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 29. Further, the allegations in Paragraph 29 are summary in nature and require no response.**

30.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[8]

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 30. Further, the allegations in Paragraph 30 are summary in nature and require no response.**

31.     Recognizing the severe threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-chairmen of the Congressional Bi-Partisan Privacy Caucus sent

---

[6] *See* M. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), available at http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/.

[7] N. Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), available at https://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html#:~:text=It's%20called%20the%20Acxiom%20Corporation,to%20know%20much%2C%20much%20more.

[8] Letter from Sen. J. Rockefeller IV, Sen. Cmtee. On Commerce, Science, and Transportation, to S. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) available at https://www.commerce.senate.gov/services/files/3bb94703-5ac8-4157-a97b-%20a658c3c3061c.

a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data, stating in pertinent part:

By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on ever U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[9]

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 31. Further, the allegations in Paragraph 31 are summary in nature and require no response.**

32.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers. In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams, including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like Continued.com, LLC share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[10]

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 32. Further, the allegations in Paragraph 32 are summary in nature and require no response.**

---

[9] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Sen. Markey (July 24, 2012), available at https://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information.

[10] *See* Charles Duhigg, *Bilking the Elderly, with a Corporate Assist*, N.Y. Times (May 20, 2007), available at https://www.nytimes.com/2007/05/20/business/20tele.html

33. Disclosures like Defendant's are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[11]

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 33. Further, the allegations in Paragraph 33 are summary in nature and require no response.**

34. The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers.[12]

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 34. Further, the allegations in Paragraph 34 are summary in nature and require no response.**

35. Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged. Thus, information disclosures like Defendant's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[13]

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 35. Further, the allegations in Paragraph 35 are summary in nature and require no response.**

36. Defendant is not alone in violating its customers' statutory rights and jeopardizing their well-being in exchange for increased revenue: disclosing customer and subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties has become a widespread practice. Unfortunately for consumers, however, this growth has come at the expense of their most basic privacy rights.

---

[11] *Id.*
[12] Prepared Statement of the FTC on "Fraud Against Seniors" before the Special Committee on Aging, United States Senate (August 10, 2000).
[13] *Id.*

13

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 36. Further, the allegations in Paragraph 36 are summary in nature and require no response. Continued denies that it has violated its customers' statutory rights or jeopardized their well-being.**

II.     **Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases**

37.     As the data aggregation industry has grown, so has consumer concerns regarding personal information.

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 37. Further, the allegations in Paragraph 37 are summary in nature and require no response.**

38.     A survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do protect their privacy online.[14] As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[15]

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 38. Further, the allegations in Paragraph 38 are summary in nature and require no response.**

39.     Thus, as consumer privacy concerns grow, consumers increasingly incorporate privacy concerns and values into their purchasing decisions, and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors. In fact, consumers' personal

---

[14] *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, https://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf.
[15] *Id.*

14

information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[16]

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 39. Further, the allegations in Paragraph 39 are summary in nature and require no response.**

40. These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[17]

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 40. Further, the allegations in Paragraph 40 are summary in nature and require no response.**

41. Thus, in today's digital economy, individuals and businesses alike place a real, quantifiable value on consumer data and correspondence privacy rights.[18] As such, where a business offers customers a product or service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a product or service of less value than the product or service paid for.

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 41. Further, the allegations in Paragraph 41 are summary in nature and require no response.**

## III. Defendant is a Videotape Service Provider

---

[16] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), available at https://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html.

[17] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); see also European Network and Information Security Agency, Study on Monetizing Privacy (Feb. 27, 2012), available at https://www.enisa.europa.eu/publications/monetising-privacy.

[18] See Hann, et al., The Value of Online Information Privacy: An Empirical Investigation (Oct. 2003) at 2, available at https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf

42.     Defendant sells video services on each website within its family of websites, which provide each consumer with unlimited access to prerecorded videos hosted on that site.

**ANSWER: Continued denies that it "sells video services" providing "unlimited access to prerecorded videos." Continued sells subscription services that allow individuals to access continuing education content through a variety of modalities, approved by the credentialing agencies for licensed professionals. Continued denies the remaining allegations in Paragraph 42.**

43.     Each video service includes access to prerecorded videos that are accessible in an unlimited fashion during the subscription period. The prerecorded videos are continuing education courses on various topics.

**ANSWER: Continued denies that each subscription is a "video service" that includes "access to prerecorded videos" "in an unlimited fashion." Continued's subscription services provide access to continuing education content through multiple modalities. Continued denies the remaining allegations in Paragraph 43.**

44.     The screenshot below depicts an example of the prerecorded on-demand courses that are available in the video service on Defendant's websites:



**ANSWER: Admit that the video referenced in Paragraph 44 exists on a website maintained by Continued.com. Continued denies the remaining allegations in Paragraph 44.**

45.     When the video listed above was requested or obtained, Defendant's configuration of the Meta Pixel disclosed the title of the video alongside the consumer's FID. Additionally, the

Meta Pixel also disclosed the exact moment that the "play" button was clicked, signifying that the consumer (by contemporaneous disclosure of the FID) took that action directed to the specific video on Defendant's website.

**ANSWER: Denied.**

46.     Defendant's websites each describe the video service as "mobile-friendly," granting Plaintiff and other consumers access to "continuing education courses and content anywhere, on any device, including your phone and tablet."

> **ANSWER: Admit that certain Continued.com websites state that their services are mobile friendly and grant access to continuing education content.**

47.     Defendant's websites also explain that its video service includes a "course library" of prerecorded videos.



> **ANSWER: Admit that certain websites maintained by Continued.com include a course library.**

48.     Each prerecorded video that is available within the video service's course library is listed on Defendant's website as shown below:

> **ANSWER: Admit that users can access the course library on certain websites maintained by Continued.com.**

17

49.     By clicking "Join Now" as show above, Defendant's configuration of the Meta Pixel disclosed the consumer's FID alongside their "subscription" to the total access video service and a custom URL associated therewith.

**ANSWER: Denied.**

50.     Defendant's speech pathology video service includes access to 606 prerecorded video courses.

> **ANSWER: Continued admits that its speech pathology services include access to continuing education content delivered through multiple modalities, approved by the credentialing agencies for licensed professionals. Continued denies that its speech pathology services constitute a "video service" and denies the remaining allegations in Paragraph 50.**

51.     Defendant's audiology online video service includes access to 1,525 prerecorded video courses.

> **ANSWER: Continued admits that its audiology services include access to continuing education content delivered through multiple modalities, approved by the credentialing agencies for licensed professionals. Continued denies that its audiology services constitute a "video service" and denies the remaining allegations in Paragraph 51.**

52.     Defendant's occupational therapy video service includes access to 580 prerecorded video courses.

> **ANSWER: Continued admits that its occupational therapy services include access to continuing education content delivered through multiple modalities, approved by the credentialing agencies for licensed professionals. Continued denies that its occupational therapy services constitute a "video service" and denies the remaining allegations in Paragraph 52.**

53.     Defendant's physical therapy video service includes access to 495 prerecorded video courses.

> **ANSWER: Continued admits that its physical therapy services include access to continuing education content delivered through multiple modalities, approved by the credentialing agencies for licensed professionals. Continued denies that its**

**physical therapy services constitute a "video service" and denies the remaining allegations in Paragraph 53.**

IV. **Defendant Uses the Meta Pixel to Systemically Disclose its Customers' Private Video Information to Meta**

54. As alleged below, when a consumer requests or obtains a video service from one of Defendant's Websites, the Meta Pixel technology that Defendant intentionally installed on its Websites transmits (1) the consumer's FID, (2) the specific title of the video service, (3) the specific title of the videos requested or obtained using that package, and (4) the URL where the video service is available for purchase or the specific prerecorded videos are available for viewing, without the consumer's content and in clear violation of the VPPA.

> **ANSWER: Admit that the Meta Pixel can transmit certain user information from websites maintained by Continued.com to third parties. Continued denies the remaining allegations in Paragraph 54.**

A. **The Meta Pixel**

55. On February 4, 2004, Mark Zuckerberg and others launched Facebook, now known as "Meta".[19] Meta is now the world's largest social media platform. To create a Meta account, a person must provide, *inter alia*, his or her first and last name, birth date, gender, and phone number or email address.

> **ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 55.**

56. The Meta Pixel, first introduced in 2013 as the "Facebook Pixel," is a unique string of code that companies can embed on their websites to monitor and track the actions taken by visitors to their websites and to report them back to Meta. This allows companies like Defendant to build detailed profiles about their customers and to serve them with highly targeted advertising.

---

[19] *See* Facebook, "Company Info," available at https://about.fb.com/company-info./

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 56 regarding the introduction of the Meta Pixel. Continued denies the remaining allegations in Paragraph 56.**

57.     Additionally, a Meta Pixel installed on a company's website allows Meta to "match [] website visitors to their respective Facebook User accounts.[20] This is because Meta has assigned to each of its users an "FID" number – a unique and persistent identifier that allows anyone to look up the user's unique Meta profile and thus identify the user by name[21] – and because each transmission of information made from a company's website to Meta via the Meta Pixel is accompanied by, *inter alia*, the FID of the website's visitor. Moreover, the Meta Pixel can follow a consumer to different websites and across the Internet even after the consumer's browser history has been cleared.

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 57. Further, the allegations in Paragraph 57 are summary in nature and require no response.**

58.     As Meta's developer's guide explains, installing the Meta Pixel on a website allows Meta to track actions that users with Meta accounts take on the site. Meta states that "Examples of [these] actions include adding an item to their shopping cart or making a purchase."[22]

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 58. Further, the allegations in Paragraph 58 are summary in nature and require no response.**

59.     Meta's Business Tools Terms govern the use of Meta's Business Tools, including the Meta Pixel.[23]

---

[20] Meta, "Get Started – Meta Pixel," available at https://developers.facebook.com/docs/meta-pixel/get-started/.

[21] For example, Mark Zuckerberg's FID is reportedly the number "4," so logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck, and all of the additional personally identifiable information contained therein.

[22] Meta, "About Meta Pixel," available at https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[23] Meta, "Meta Business Tools Terms," available at https://www.facebook.com/legal/technology_terms.

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 59. Further, the allegations in Paragraph 59 are summary in nature and require no response.**

60.     Meta's Business Tools Terms state that website operators may use Meta's Business Tools, including the Meta Pixel, to transmit the "contact information" and "event data" of their website's visitors to Meta.

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 60. Further, the allegations in Paragraph 60 are summary in nature and require no response.**

61.     Meta's Business Tools Terms define "contact information" as "information that personally identifies individuals, such as names, email addresses, and phone numbers . . . ."[24]

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 61. Further, the allegations in Paragraph 61 are summary in nature and require no response.**

62.     Meta's Business Tools Terms state: "You instruct us to process the contact information solely to match the contact information against user IDs [e.g., FIDs] ("Matched User IDs"), as well as to combine those user IDs with corresponding event data."[25]

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 62. Further, the allegations in Paragraph 62 are summary in nature and require no response.**

63.     The Business Tools Terms define "event data" as, *inter alia*, "information that you share about people and the actions that they take on your websites and apps or in your shops, such as visits to your sites, installations of your apps, and purchases of your products."[26]

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 63. Further, the allegations in Paragraph 63 are summary in nature and require no response.**

---

[24] *Id.*
[25] *Id.*
[26] *Id.*

64.     Website operators use the Meta Pixel to send information about visitors to their websites to Meta. Every transmission to Meta accomplished through the Meta Pixel includes at least two elements: (1) the website visitor's FID and (2) the webpage's URL triggering the transmission.

> **ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 64. Further, the allegations in Paragraph 64 are summary in nature and require no response.**

65.     Depending on the configuration of the Meta Pixel, the website may also send event data to Meta. Defendant has configured the Meta Pixel on its Websites to send event data to Meta, such as Page View, Subscribe, "Play" button click to initiate a video starting, and more.

> **ANSWER: Admit that the Meta Pixel has been configured on certain websites maintained by Continued, which makes it possible for such websites to "send" information about website user history. Continued denies the remaining allegations in Paragraph 65.**

66.     When website operators make transmissions to Meta through the Meta Pixel, neither the visitor's FID, the website URL, nor the event data are hashed or encrypted.

> **ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 66.**

67.     Every website operator installing the Meta Pixel must agree to the Meta Business Tools Terms.[27]

> **ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 67.**

68.     Moreover, the Meta Pixel can follow a consumer to different websites and across the Internet even after the consumer's browser history has been cleared.

> **ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 68.**

---

[27] *See id.*

22

69.     Meta has used the Meta Pixel to amass a vast digital database of dossiers comprised of highly detailed personally identifying information about each of its billions of users worldwide, including information about all of its users' interactions with any of the millions of websites across the Internet on which the Meta Pixel is installed. Meta then monetizes this Orwellian database by selling advertisers the ability to serve highly targeted advertisements to the persons whose personal information is contained within it.

**ANSWER: Continued lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 69.**

70.     Simply put, if a company chooses to install the Meta Pixel on its website, both the company who installed it and Meta (the recipient of the information it transmits) are then able to "track [] the people and type of actions they take,"[28] including, as relevant here, the video service and any video accessed under that package on any one of Defendant's Websites.

**ANSWER: Admit that the Meta Pixel allows website operators and Meta to track certain website user data.**

**B.  Defendant Knowingly Uses the Meta Pixel to Transmit the Private Video Information of its Customers to Meta**

71.     Defendant's video service specifically includes exclusive access to prerecorded video content including a video library of on-demand videos, courses, and continuing education.

**ANSWER: Continued denies that its services "specifically include[] exclusive access to prerecorded video content." Continued's subscription services provide access to a comprehensive library of continuing education materials in multiple modalities, approved by the credentialing agencies for licensed professionals. Continued denies the remaining allegations in Paragraph 71.**

---

[28] Meta, "Retargeting: How to Advertise to Existing Customers with Ads on Facebook," available at https://www.facebook.com/business/goals/retargeting?checkpoint_src=any.

72.     To purchase a video service to access prerecorded video material on any one of Defendant's Websites, a person must provide at least his or her name, email address, billing address, and credit or debit card (or other form of payment) information.

**ANSWER: Admit that to purchase a subscription to access continuing education materials on any one of Continued's websites, a person must provide at least his or her name, an email address, billing address, and credit or debit card (or other form of payment) information so that Continued is able to provide transcripts to professional credentialing agencies for licensure for the professional. Continued denies the characterization that such subscriptions are for the purpose of accessing "prerecorded video material," as Continued's subscriptions provide access to continuing education content delivered through multiple modalities, which are approved by credentialing agencies.**

73.     When a consumer is purchasing the video service to gain access to the prerecorded videos on any one of Defendant's Websites, Defendant uses —and has used at all times relevant hereto—the Meta Pixel to disclose to Meta the unencrypted FID of the purchaser and the fact that the person is requesting or obtaining a video service from Defendant's website.

**ANSWER: Denied.**

74.     After purchasing access to Defendant's website by way of the video service, Defendant uses —and has used at all times relevant hereto—the Meta Pixel to disclose to Meta the unencrypted FID of the subscriber and the titles of the specific videos requested or obtained on Defendant's website.

**ANSWER: Denied.**

75.     Defendant intentionally programmed its websites (by following step-by-step instructions from Meta's website) to include a Meta Pixel that systematically transmits to Meta the FIDs of its purchasers and subscribers, the title of the video service, the titles of the videos requested or obtained, and the URL where the video service and videos are available in order to

24

take advantage of the targeted advertising and other informational and analytical services offered by Meta.

**ANSWER: Denied.**

76. With only a person's FID and the knowledge that a person purchased a total access video service on Defendant's website—all of which Defendant knowingly provides to Meta—any ordinary person could learn the identity of the person to whom the FID corresponds and the specific video services that this person requested. This can be accomplished simply by accessing the URL www.facebook.com/[unencrypted FID]/. However, Defendant's configuration of the Meta Pixel goes further and discloses the titles of the specific videos requested or obtained by a subscriber after the total access video service is purchased. Thus, Defendant's disclosure informs any ordinary person of a consumer's (1) FID, (2) their purchase of a total access subscription to Defendant's video service (including the URL where it is available for purchase), (3) the specific videos requested or obtained using that video service (including the URL where each video is available for viewing).

**ANSWER: Denied.**

77. Defendant's practices of disclosing that Plaintiff and members of the Classes purchased video services on any one of Defendant's websites and the titles of the videos requested or obtained using that video service to Meta continued unabated for the full duration of the time period relevant to this action. At all times relevant hereto, whenever Plaintiff or another consumer of Defendant's family of websites requested or obtained a particular video service (by clicking on it) or requested or obtained a prerecorded video from any one of Defendant's Websites, Defendant disclosed to Meta that (inter alia) the consumer requested or obtained a total access subscription to video services and later reveals the titles of the specific video requested or obtained using that

25

video service, along with the FID of the consumer who requested it (which, as discussed above, uniquely identifies the person).

**ANSWER: Denied.**

78. At all relevant times, Defendant knew the Meta Pixel disclosed its subscribers' Private Video Information to Meta.

**ANSWER: Denied.**

79. Defendant could easily have programmed its websites so that none of its subscribers' detailed Private Video Information is disclosed to Meta. Instead, Defendant chose to program its websites so that all of its subscribers' detailed Private Video Information is sent to Meta *en masse*.

**ANSWER: Denied.**

80. Prior to transmitting its subscribers' Private Video Information to Meta, Defendant failed to notify Plaintiff or any of its other subscribers that it would do so, and neither Plaintiff nor any of its other subscribers have consented (in writing or otherwise) to these practices.

**ANSWER: Denied.**

81. By intentionally disclosing to Meta Plaintiff's and its other subscribers' FIDs together with information that they each purchased a total access subscription to a video service on any one of Defendant's websites and the titles of videos requested or obtained using that service, without any of their consent to these practices, Defendant knowingly violated the VPPA on an enormous scale.

**ANSWER: The allegations in Paragraph 81 state a legal conclusion to which a response is not required. To the extent a response is required, Continued denies the allegations in Paragraph 81.**

26

## CLASS ACTION ALLEGATIONS

82.     Plaintiff seeks to represent a class defined as all persons in the United States who, during the two years preceding the filing of this action, purchased a video service on any one of Defendant's websites and accessed prerecorded videos using that service while maintaining an account with Meta Platforms, Inc. f/k/a Facebook, Inc.

> **ANSWER: The allegations in Paragraph 82 state a legal conclusion to which a response is not required. To the extent a response is required, Continued denies the allegations in Paragraph 82.**

83.     Class members are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in at least the tens of thousands. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the membership records of Defendant.

> **ANSWER: The allegations in Paragraph 83 state a legal conclusion to which a response is not required. To the extent a response is required, Continued denies the allegations in Paragraph 83.**

84.     Common questions of law and fact exist for all Class members and predominate over questions affecting only individual class members. Common legal and factual questions include but are not limited to (a) whether Defendant embedded Meta Pixel on its Websites that monitors and tracks actions taken by visitors to its Website; (b) whether Defendant reports the actions and information of visitors to Meta; (c) whether Defendant knowingly disclosed Plaintiff's and Class members' Private Video Information to Meta; (d) whether Defendant's conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710; and (e) whether Plaintiff and Class members are entitled to a statutory damage award of $2,500, as provided by the VPPA.

**ANSWER: The allegations in Paragraph 84 state a legal conclusion to which a response is not required. To the extent a response is required, Continued denies the allegations in Paragraph 84.**

85.     The named Plaintiff's claims are typical of the claims of the Class in that the Defendant's conduct toward the putative class is the same. That is, Defendant embedded Meta Pixel on its Websites to monitor and track actions taken by consumers on its Websites and report this to Meta. Further, the named Plaintiff and the Class members suffered invasions of their statutorily protected right to privacy (as afforded by the VPPA), as well as intrusions upon their private affairs and concerns that would be highly offensive to a reasonable person, as a result of Defendant's uniform and wrongful conduct in intentionally disclosing their Private Purchase Information to Meta.

**ANSWER: The allegations in Paragraph 85 state a legal conclusion to which a response is not required. To the extent a response is required, Continued denies the allegations in Paragraph 85.**

86.     Plaintiff is an adequate representative of the Class because she is interested in the litigation; her interests do not conflict with those of the Class members she seeks to represent; she has retained competent counsel experienced in prosecuting class actions; and she intends to prosecute this action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of all Class members.

**ANSWER: The allegations in Paragraph 86 state a legal conclusion to which a response is not required. To the extent a response is required, Continued denies the allegations in Paragraph 86.**

87.     The class mechanism is superior to other available means for the fair and efficient adjudication of Class members' claims. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and

28

expense to all parties and multiplies the burden on the judicial system presented by this case's complex legal and factual issues. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication of the common questions of law and fact, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**ANSWER: The allegations in Paragraph 87 state a legal conclusion to which a response is not required. To the extent a response is required, Continued denies the allegations in Paragraph 87.**

## CAUSE OF ACTION
**Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710**

88. Plaintiff repeats the allegations asserted in the preceding paragraphs as if fully set forth herein.

**ANSWER: Continued incorporates by reference its responses to the preceding paragraphs.**

89. The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

**ANSWER: The allegations in Paragraph 89 state a legal conclusion to which a response is not required.**

90. As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]" Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it is engaged in the

29

business of selling and delivering prerecorded video materials, similar to prerecorded video cassette tapes, to consumers nationwide.

**ANSWER: The allegations in Paragraph 90 state a legal conclusion to which a response is not required. To the extent a response is required, Continued denies the allegations in Paragraph 90.**

91.     As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or consumer of goods or services from a video tape service provider." As alleged above, Plaintiff and Class members are each a "consumer" within the meaning of the VPPA because they each purchased a subscription to a total access video service and requested or obtained prerecorded videos from one of Defendant's Websites that were sold and delivered to them by Defendant.

**ANSWER: The allegations in Paragraph 91 state a legal conclusion to which a response is not required. To the extent a response is required, Continued denies the allegations in Paragraph 91. Continued denies that Plaintiff and/or putative class members are "consumers" within the meaning of the VPPA because Continued is not a "video tape service provider" as defined by the statute. Plaintiff and/or putative class members members purchased subscriptions to a continuing education platform, not a "total access video service," and the subscription provides access to continuing education content delivered through multiple modalities, approved by the credentialing agencies for licensed professionals.**

92.     As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." The Private Video Information that Defendant transmitted to Meta constitutes "personally identifiable information" as defined in 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and Class members to Meta as an individual who purchased, and thus "requested or obtained," a subscription to a total access video services from one of Defendant's Websites and it later identified the specific prerecorded video content requested or obtained using that service.

30

**ANSWER: The allegations in Paragraph 92 state a legal conclusion to which a response is not required. To the extent a response is required, Continued denies the allegations in Paragraph 92.**

93.     Defendant knowingly disclosed Plaintiff's and Class members' Private Video Information to Meta via the Meta Pixel technology because Defendant intentionally installed and programmed the Meta Pixel code on its Websites, knowing that such code would transmit that total access to a video service was purchased and later the titles of the specific prerecorded videos requested or obtained using that service, which were disclosed each alongside the consumers' unique identifiers (including FIDs and device information).

**ANSWER: The allegations in Paragraph 93 state a legal conclusion to which a response is not required. To the extent a response is required, Continued denies the allegations in Paragraph 93.**

94.     Defendant failed to obtain informed written consent from Plaintiff or Class members authorizing it to disclose their Private Video Information to Meta or any other third party. More specifically, at no time prior to or during the applicable statutory period did Defendant obtain from any person who purchased a subscription to access prerecorded video material or services on its Websites (including Plaintiff or Class members) informed, written consent that was given in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer, that was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner, or that was given after Defendant provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. *See* 18 U.S.C. § 2710(b)(2).

**ANSWER: The allegations in Paragraph 94 state a legal conclusion to which a response is not required. To the extent a response is required, Continued denies the allegations in Paragraph 94.**

31

95.     By disclosing Plaintiff's and Class members' Private Video Information, Defendant violated their statutorily protected right to privacy in their Private Video Information.

> **ANSWER: The allegations in Paragraph 95 state a legal conclusion to which a response is not required. To the extent a response is required, Continued denies the allegations in Paragraph 95.**

96.     Consequently, Defendant is liable to Plaintiff and Class members for damages in the statutorily set sum of $2,500. 18 U.S.C. § 2710(c)(2)(A).

> **ANSWER: The allegations in Paragraph 96 state a legal conclusion to which a response is not required. To the extent a response is required, Continued denies the allegations in Paragraph 96.**

## AFFIRMATIVE DEFENSES

1.     Plaintiff and/or the putative class members fail to state a claim upon which relief can be granted.

2.     Plaintiff's and/or the putative class members' claims are barred, in whole or in part, by her or their own wrongful conduct or unclean hands.

3.     Plaintiff's and/or the putative class members' claims are barred because those claims are inconsistent with the VPPA.

4.     Plaintiff's and/or the putative class members' claims are barred by the doctrines of estoppel, statute of limitations, laches, and/or waiver.

5.     Plaintiff and/or the putative class members did not experience a VPPA violation in the relevant time period.

6.     Plaintiff and/or the putative class members have not pleaded an adequate basis for class certification, and that class relief or certification is appropriate because the required elements of adequacy, commonality, typicality, and/or preponderance are not present.

7     This action cannot be maintained as a class action because (a) there are no significant questions of law or fact common to the class; (b) Plaintiff's and/or the putative class members' claims are not typical of the claims of the members of the putative class; (c) Plaintiff is not an adequate class representative and cannot fairly and adequately protect the interests of the putative class; (d) adjudication of separate actions by individual class members would not be dispositive of other class members' interests; (e) a class action is not a superior method for the fair and efficient adjudication of the controversy; (f) the putative class is not properly defined or

32

readily ascertainable; and (g) other requirements for maintaining this action as a class action have not been satisfied. Further, any adjudication of Plaintiff's and/or the putative class members' claims will require individualized inquiry on the question of injury and damages.

8.  The First Amended Complaint does not state facts sufficient to certify a class. Therefore, this action is not properly brought as a class action.

9.  Continued is not a video tape service provider as defined by the VPPA. Continued is primarily engaged in the business of providing continuing education services through a multi-modality platform. Continued does not fall within the VPPA's definition of a "video tape service provider" as an entity "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). Because Continued is not a "video tape service provider," Plaintiff and the putative class members are not "consumers' within the meaning of the VPPA, which defines that terms as "a renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1).

10.  Continued did not act with knowledge as required by the VPPA.

11.  Continued did not transmit personally identifiable information as required by the VPPA.

12.  Plaintiff and/or the putative class members lack standing, either individually or in a representative capacity, to assert a claim for violation of the VPPA.

13.  Plaintiff and/or the putative class members have not suffered injuries in fact that are fairly traceable to the conduct alleged in the First Amended Complaint . In addition, neither Plaintiff nor the putative class members are "aggrieved person[s]" as defined in 18 U.S.C. § 2710(b)(1).

14.  Plaintiff and/or the putative class members have incurred no cognizable damages.

15.  Plaintiff's VPPA claim and/or the VPPA claim made by the putative class members is barred because this case is not maintainable as a class action under Federal Rule of Civil Procedure 23 as the putative class does not satisfy the requirements described therein.

16.  Plaintiff's VPPA claim and/or the VPPA claim made by the putative class members is barred, in whole or in part, because Defendants' alleged conduct falls within the VPPA's "ordinary course of business" exception under 18 U.S.C. § 2710(b)(2)(E).

17.  To the extent Plaintiff and the putative class members seek injunctive relief, such relief is barred because Plaintiff and the putative class members have not suffered irreparable harm and/or there is no real, immediate, or ongoing threat of injury.

18.  Plaintiff's VPPA claim and/or the VPPA claim of the putative class members is barred, in whole or in part, by consent.

19.     At all times, Continued acted in good faith and has reasonable grounds for believing its actions were in compliance with the VPPA.

20.     Continued denies all allegations not expressly admitted and specifically reserves all affirmative or other defense that it may have a against the putative class. It is not necessary at this time for Defendant to delineate such defenses against the putative class because it has not been certified. Further, the putative class members are not parties to this litigation.

21.     Continued reserves the right to plead, assert, and rely on all proper additional affirmative defenses as they become known through discovery or otherwise.

**WHEREFORE,** Continued requests that this Court enters an Order:

1.     Dismissing the First Amended Complaint with prejudice;
2.     Entering judgment against Plaintiff;
3.     Awarding Continued its costs of suit, including reasonable attorney's fees;
4.     Granting such and other further relief as the Court deems just and necessary.


Dated: May 26, 2026

Respectfully submitted,

*/s/ William E. Braff*
Beth A. Bryan (0082076)
William E. Braff (0098773)
TAFT STETTINIUS & HOLLISTER LLP
301 E. Fourth Street, Suite 2800
Cincinnati, Ohio 45202-3957
Phone: (513) 381-2838
Fax: (513) 381-0205
bryan@taftlaw.com
bbraff@taftlaw.com

*Counsel for Defendant Continued.com, LLC*

34

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the above was filed electronically on May 26, 2026. Notice of this filing will be sent to all parties through the Court's electronic filing system.

*/s/ William E. Braff*